[Cite as *Jezerinac v. Dioun*, 2019-Ohio-726.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ronald M. Jezerinac, et al., | : | |
| Plaintiffs-Appellees, | : | |
| | | No. 18AP-479 |
| v. | : | (C.P.C. No. 16CV-7939) |
| Mo M. Dioun, et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellants. | : | |

D E C I S I O N

Rendered on February 28, 2019

**On brief:** *Hahn Loeser & Parks LLP, Marc J. Kessler*, and *Jordan D. Rauch*, for appellees, Ronald M. Jezerinac and Tiffany Sexton. **Argued:** *Marc J. Kessler.*

**On brief:** *Allen Kuehnle Stovall & Neuman LLP, Todd H. Neuman, Rick L. Ashton*, and *Jeffrey R. Corcoran*; *David A. Kopech* for appellants. **Argued:** *Rick L. Ashton.*

**On brief:** *Bailey Cavalieri, LLC, James G. Ryan, Timothy A. Riedel*, and *Matthew T. Schaeffer*, for intervenor-appellee, Brewery Real Estate Partnership. **Argued:** *Matthew T. Schaeffer.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendants-appellants, Mo M. Dioun and Mina L. Dioun, appeal several decisions of the Franklin County Court of Common Pleas culminating in a decision entered on June 4, 2018 denying a receiver's motion to accept a $4.2 million offer from Taste Hospitality Group Ltd. to purchase the partnerships and corporations that own Barley's Brewing Company, and ordering the receiver to instead accept an offer from LLJBucksBrew, LLC for $1.875 million. Because we find that the lease between Barley's Brewing Company and its current landlord is assignable without the landlord's agreement

to certain parties based on a January 2, 2013 amendment and is assignable with the landlord's permission (which shall not unreasonably be withheld) to any interested party pursuant to lease provision 9.01(a), we sustain Dioun's second and third assignments of error. We decline to address the first assignment of error on the grounds that it is unripe. We therefore reverse and remand with instructions.

## I.  INTRODUCTION & PARTIES

{¶ 2}   Before addressing the facts and procedural history of this case, it is helpful for the sake of clarity to review the relevant entities and their relation to one another as matters undisputedly existed when this litigation began.  Barley's Brewing Company and Brewcadia (collectively, "Barley's") are the names given to a restaurant, pub, and classic video game arcade operated out of a certain premises located at 467 North High Street, Columbus, Ohio, 43215.  Those businesses are owned by Brewpub Restaurant Limited Partnership ("BRLP").  BRLP is composed of several limited partner investors and one general partner, Brewpub Restaurant Corporation ("BRC"), which owns 50 percent of BRLP.  BRLP's general partner, BRC, is owned 50/50 by the Dioun and plaintiff-appellee Ronald M. Jezerinac families.  Dioun and Jezerinac also apparently own some additional limited partnership stakes in BRLP, but the record is not clear as to the extent or percentages of the families' ownership further, indirect ownership interests in BLRP.  The final entity relevant to this appeal is intervenor-appellee Brewery Real Estate Partnership ("BREP").[1]  BREP owns the building at 467 North High Street and leases it to BRLP.  BREP is composed of many of the same partners as the partners who compose BRLP, including Jezerinac (who apparently owns more than a third of BREP) but not including Dioun.  This appeal concerns the sale of BRC and BRLP and whether the lease between BREP and BRLP should be interpreted to permit BREP to effectively limit who may buy BRLP and BRC.

## II. FACTS AND PROCEDURAL HISTORY

{¶ 3}   By a complaint filed on August 23, 2016, plaintiffs, including Ronald Jezerinac and Tiffany Sexton (collectively, "Jezerinac"), in their individual capacities and derivatively as interest holders in various businesses, sued Mo Dioun, Mina Dioun, and

---

[1] It is not entirely clear from the record what corporate form BREP takes.  It is called a partnership throughout the record and its constituent entities refer to themselves as partners.  *See, e.g.*, Lyon Aff. at ¶ 1, Ex. A attached to May 1, 2018 BREP Resp. in Opp. to Taste Offer.  Yet in the lease to BRLP, BREP refers to itself as an LLC. (BRLP & BREP Lease at introduction, attached to Aug. 1, 2017 BREP Brief on Termination.)

their daughter and son-in-law, Adam and Sheila Trautner (collectively, "Dioun"), as well as various business entities associated with the individual plaintiffs and defendants. (Aug. 23, 2016 Compl.) Most of the specific allegations in the complaint are not relevant to this appeal, but essentially, the complaint accused Dioun of various business betrayals and sought a business divorce between the Jezerinac and Dioun families. *Id.* In service of that goal, the complaint repeatedly suggested that the appointment of a receiver might be appropriate to effectuate the disentangling of the two families' business interests. *Id.* at ¶ 136, 141, 145, 149, 153. On October 17, 2016, Dioun answered and counterclaimed, accusing Jezerinac of financial betrayals and an attempt to squeeze him out of some of their business ventures. (Oct. 17, 2016 Answer & Counterclaim at ¶ 4-9.)[2] Among the many claims in the counterclaim, Dioun also moved the trial court to appoint a receiver to untangle and, if necessary, dissolve and liquidate the parties' jointly owned businesses and their assets, including BRC and BRLP. *Id.* at ¶ 170-72, 180-82.

{¶ 4} Both sides then moved for the appointment of a receiver. (Jan. 24, 2017 Dioun Mot. for Receiver; Feb. 6, 2017 Jezerinac Mot. for Receiver.) The parties agreed that Barley's was a thriving enterprise and that this was not the typical case in which a receiver is appointed to liquidate a failing business. Nonetheless, both sought the appointment of a receiver under R.C. 2735.01(A)(7). (Jan. 24, 2017 Dioun Mot. for Receiver at 6; Feb. 6, 2017 Jezerinac Mot. for Receiver at 15.) Dioun sought for the receiver to, among other tasks, be appointed to manage BRC and its assets, including BRLP, in order to formulate and implement a bidding or sale process to monetize and disentangle the two families' interests. (Dioun Mot. for Receiver at 2.)

{¶ 5} Jezerinac sought a receiver for BRC and BRLP yet simultaneously pointed to the fact that, under BRLP's partnership agreement, such an action triggers a withdrawal of BRC as general partner and a dissolution of BRLP. (Jezerinac Mot. for Receiver at 2-4.) That is, BRLP's "Agreement of Limited Partnership" includes provisions automatically withdrawing the general partner in the event of three occurrences: first, if the general partner seeks, consents to, or acquiesces in the appointment of a receiver; second, if a receiver is appointed for the general partner and not dismissed within 90 days; or third, if

---

[2] Paragraph numbering begins anew for the counterclaim portion of the combined counterclaim and answer. This citation refers to the counterclaim paragraphs.

the general partner is the subject of an action seeking reorganization, liquidation, or dissolution and the action is not dismissed within 120 days. (BRLP Partnership Agreement at 9.3(f-g), Ex. B attached to Jezerinac Mot. to Appoint Receiver.) In the event the sole general partner withdraws, the agreement provides that BRLP is dissolved unless, within 90 days, the remaining limited partners agreed to continue the business and to appoint at least one new general partner. *Id.* at 10.1(e). Despite these agreed to deadlines and contingencies, the trial court stayed the running of the business deadlines in the case. (Nov. 29, 2016 Order at 1; Jan. 4, 2017 Order at 1.)

{¶ 6} After considerable briefing by the two main factions and additional briefs by other, intervening limited partners, the trial court appointed a receiver (the individual proposed by Jezerinac) "for the purpose of protecting and preserving, managing and operating, and collecting the necessary profits of * * * Brewpub Restaurant Corporation [BRC] [and] Brewpub Restaurant Limited Partnership [BRLP] * * * during the pendency of this action." (Mar. 10, 2017 Decision & Entry at 7.) It also forbade any "willful[] interfere[nce] with the authority of the [r]eceiver" as well as the commencement or continuation of any action or proceedings against the business or against the receiver without leave of court, and it continued to stay all activity against the businesses. *Id.* at 11-12.

{¶ 7} Approximately three months after the trial court appointed a receiver, BREP sought to intervene and moved for leave to terminate the lease between BREP and BRLP. (June 15, 2017 BREP Mot. to Intervene; May 26, 2017 BREP Mot. to Terminate.) The lease was initially for a five-year term with the option to renew two times for five years each at the discretion of the tenant. (BRLP & BREP Lease at 1.02, Ex. A attached to Aug. 1, 2017 BREP Brief on Termination.) The lease addressed assignment as follows, whether voluntary or involuntary, and as requiring "prior written approval of [BREP as] landlord":

> Tenant shall not: (i) assign or otherwise transfer * * * this Lease * * * or (iii) permit the assignment or other transfer of this Lease * * * by operation of law. * * * The sale of * * * the partnership interests of any Tenant which is a partnership, that results in the change of ownership control of Tenant shall be deemed a transfer of this Lease under [this section] and shall require the prior written approval of Landlord, which shall not be reasonably[sic] withheld.

(BRLP & BREP Lease at 9.01(a).) But an amendment (executed on January 2, 2013) adds a sentence to the end of subsection 9.01(a) of the lease, basically easing the effect of assignment if the Jezerinacs and persons known to them for at least three years are involved:

> The foregoing sentence not withstanding, [sic] Landlord's approval is not required if the change of ownership control results from a transfer of stock or partnership interests owned by Lillian Jezerinac or Ronald Jezerinac to a person or persons personally known to them for a period of not less than three (3) years prior to such transfer.

(BRLP & BREP Lease at Jan 2, 2013 Amendment at 1.) Another amendment executed at around the same time amends the term of the lease to provide an option to renew five times for five years each at the discretion of the tenant. (BRLP & BREP Lease at Dec. 31, 2012 Amendment at 1.03.)

{¶ 8} The lease also provides that it is a default under the lease, "If a receiver * * * shall be appointed * * * for Tenant [BRLP] * * * and such receivership * * * shall not be set aside within thirty (30) days after such appointment." (BRLP & BREP Lease at 11.01(c).) In the event of default, BREP is empowered by the lease to terminate the agreement on ten days' notice to the tenant. *Id.* at 11.02(a). An additional ground of termination arises if a transfer of the lease occurs that requires notice to the landlord, and upon receipt of such notice the "Landlord shall have the right * * * to terminate this Lease." *Id.* at 9.01(b).

{¶ 9} In July 2017, the trial court held a hearing and decided to require briefing on two questions:

> 1) May the Receiver assign to a third party or may the landlord terminate the lease between Brewpub Restaurant Limited Partnership, as tenant, and Brewery Real Estate Partnership, as landlord?
>
> 2) Does the Court have the power to stay/enjoin any action regarding said lease termination and/or assignment?

(July 19, 2017 Order at 1; July 12, 2017 Hearing Tr. in passim, filed June 25, 2018.) After both sides submitted briefs and the trial court also heard from intervening limited partners and BREP, it rendered a decision on August 24, 2017. (Aug. 24, 2017 Decision & Entry.) The trial court found that it did not have the power to assign the Lease "outside the terms of the contract" but that it did have the power to temporarily stay action by the landlord.

*Id.* at 1. The trial court quoted subsection 9.01(a) of the lease but omitted the portion addressing transfers resulting from ownership changes of the tenant to which the Landlord must consent which "shall not be [un]reasonably withheld." *Compare* Aug. 24, 2017 Decision & Entry at 2 *with* BRLP & BREP Lease at 9.01(a). The trial court also excluded from its analysis the amendment eliminating the need for Landlord consent in cases where the assignees have known the Jezerinacs for at least three years. (BRLP & BREP Lease at Jan. 2, 2013 Amendment at 1.) The only explanation we can find for this omission is the trial court's stating, "this option is highly tailored, the Court finds its uses limited under the current situation." (Aug. 24, 2017 Decision & Entry at 3.) Having excluded assignment as a viable option, the trial court then found that the default provision under the lease in the event of a receivership was fair to enforce under the circumstances of the case. *Id.* at 5; BRLP & BREP Lease at 11.01(c). However, because the trial court was loath to disrupt the successful business and because the parties agreed that it could stay termination of the lease, it decided to do so. (Aug. 24, 2017 Decision & Entry at 5-6.)

{¶ 10} Shortly after the trial court's decision, Dioun, through an entity known as The Stonehenge Company ("Stonehenge"), offered to purchase BRC's interest in BRLP for $3.2 million, in addition to providing each limited partner of BRLP a choice to remain in the partnership with a $10,000 bonus or to leave and be paid out at a rate of $17,500 per 1 percent interest. (Sept 26, 2017 Notice of Stonehenge Purchase Offer at 5.) Whether limited partners chose to leave or stay under the offer, they were entitled to share in previously accrued distributions. *Id.* The offer proposed to continue BRLP as an entity thus eliminating the need for an assignment (though, de facto, an assignment would occur by the change of ownership of the general partner) and to guarantee future lease payments by placing the entire five-years of rent for each period in escrow at the beginning of each such period. *Id.*; *see also* BRLP & BREP Lease at 9.01(a), as amended by Jan 2, 2013 Amendment at 1.

{¶ 11} Jezerinac and BREP objected to the offer on the grounds that the lease was not transferable, would be terminated, and would not be available to BRLP under Stonehenge ownership. (Oct. 6, 2017 Jezerinac Objs.; Oct. 18, 2017 BREP Objections.) The court held a hearing concerning the offer on December 5, 2017. (Dec. 5, 2017 Hearing Tr. at 64-86, filed June 25, 2018.) During the hearing, the receiver opined that the offer should

be vetted and was, by no means, a ridiculous offer. *Id.* at 68-69. Nevertheless, because there was a possibility that BREP would sell 467 North High Street, such that Barley's could be sold on the open market, evaluation of the Stonehenge offer stalled. *Id.* at 65-80. During the hearing, BREP again took the position that the Stonehenge offer was not bona fide because, in light of the trial court's rulings on the lease's transferability and termination, it could not be consummated. *Id.* at 76-77. The trial court orally agreed that the offer could not go forward until the "lease problem [wa]s solved." *Id.* at 79.

{¶ 12} On January 25, 2018, the trial court held a status conference. (Jan. 25, 2018 Hearing Tr., filed June 25, 2018.) During the conference, counsel for the landlord, BREP, represented to the trial court that BREP was engaged in productive discussions with both Dioun-related parties and Jezerinac-related parties. *Id.* at 6-8. Counsel for Jezerinac requested, however, that the stay be lifted to allow BREP to terminate the current lease and go to a month-to-month arrangement to motivate the parties. *Id.* at 8-11. The trial court did not, at this juncture, grant that permission but did note that a free market sale effort for Barley's would likely be impossible without the participation and cooperation of BREP. *Id.* at 24-27.

{¶ 13} Slightly over two months later, the receiver sent notice to the parties that he had reviewed offers from a Jezerinac company, LLJBucksBrew, LLC ("LLJBucksBrew"), and a Dioun company, Taste Hospitality Group Ltd. ("Taste"), offering to purchase Barley's for $1.875 and $4.2 million respectively. (Apr. 3, 2018 Ltr. at 1, Ex. B attached to Apr. 9, 2018 Dioun Resp. to BREP Notice.) The receiver indicated, based on his determination that the Taste offer was worth substantially more to the receivership estate, he had determined to accept that offer subject to two conditions: (1) that Taste offer proof of financial ability to close;[3] and (2) that Taste provide evidence of its ability to enter into a binding lease with BREP for the premises out of which Barley's operates. *Id.* The receiver specifically indicated in his letter that he would entertain a new or revised offer from LLJBucksBrew or any other entity that might offer more value. *Id.* at 1-2.

{¶ 14} LLJBucksBrew in its offer proposed to pay $1.875 million for BRLP and BRC, $937,500 of which would go to BRC (which owned 50 percent of BRLP as a general partner and was itself owned 50/50 by Dioun and Jezerinac) and the other $937,500 would go to

---

[3] No party seems to consider the first condition to have been an obstacle to closing.

BRLP's limited partners based on their respective ownership interests. (February 1, 2018 Notice of LLJBucksBrew Purchase Offer at 2, Ex. A attached to Apr. 9, 2018 Receiver Mot. for Taste Purchase.) This worked out to $18,750 per 1 percent interest for each limited partner of BRLP and $937,500 split evenly between Dioun and Jezerinac for their interests in BRC. The LLJBucksBrew offer required that the buyer would "provide an option to certain limited partners of BRLP * * * to become a limited partner of LLJ Brewery with [LLJBucksBrew] as the General Partner," and contained the promise that "[t]hese certain limited partners w[ould] retain their same (or higher) percentage of the limited partnership interest." *Id.* at 2-3. However, in the event the "certain" limited partners elected to become partners of LLJ Brewery Ltd., the offer required such partners to "contribute" their payouts as well as all unpaid past distributions to LLJ Brewery Ltd. in exchange for partnership interest in LLJ Brewery Ltd. *Id.* at 3. The offer also contained the promise that the purchasing entity would enter a new lease with BREP. *Id.* at 2.

{¶ 15} On the other hand, the Taste offer provided for the purchase of BRC's interest in BRLP for $3.2 million, in addition to providing each limited partner of BRLP a choice to stay in the partnership with a $10,000 bonus or leave and be paid out at a rate of $20,000 per 1 percent interest. (March 2, 2018 Notice of Taste Purchase Offer at 2-3, Ex. C attached to Apr. 9, 2018 Receiver Mot. for Taste Purchase.) Under the Taste offer, whether limited partners chose to leave or stay, they were entitled to all past unpaid distributions. *Id.* at 2-3. The Taste offer proposed to either buy 467 North High Street from BREP for $3.55 million or to pay yearly rent of $285,000 (base rent under the original lease was $200,090) and to guarantee future lease payments by placing 5 years of advance rent in escrow. *Id.* at 3; BRLP & BREP Lease at 2.01(a). The Taste offer indicated skepticism about its chances of consummating its offer without court intervention, given that BREP had refused to negotiate with them. (Mar. 2, 2018 Notice of Taste Purchase Offer at 3-5.)

{¶ 16} Two days after the receiver sent notice that he intended to accept the Taste offer, contingent on Taste's ability to purchase or lease 467 North High Street, BREP filed notice with the court to the effect that it had entered into a lease agreement with LLJ Brewery Ltd. for the 467 North High Street premises to take effect whenever the court might lift the stay and allow it to terminate the existing lease. (Apr. 5, 2018 BREP Notice of Lease at 1.) The new lease indicated that LLJ Brewery Ltd. would pay yearly rent of

$290,000. (BREP & LLJ Brewery Ltd. Lease at 3.01, Ex. B to Apr. 9, 2018 Receiver Mot. for Taste Purchase.) In an attachment to its notice, BREP stated that it had rejected a lease offer from Taste. *See* Apr. 5, 2018 BREP Notice of Lease. Four days after that, the receiver filed a motion with the trial court asking the court to approve the purchase of Barley's by Taste. (Apr. 9, 2018 Receiver Mot. for Taste Purchase.)

{¶ 17} At a hearing on April 10, 2018, BREP argued that it had entered into a new lease with Jezerinac's group, LLJBucksBrew, after good faith negotiations with both interested parties. (Apr. 10, 2018 Hearing Tr. at 52-53, 61-62, filed June 25, 2018.) Taste disagreed and alleged that BREP refused even to negotiate. *Id.* at 66-67. BREP rejoined that both Taste and the parties holding interest in LLJBrewBucks had made insufficient purchase offers and that LLJ Brewery Ltd. had made a satisfactory lease offer while Taste had not. *Id.* at 72-74. In written responses to the receiver's motion to accept the Taste offer, BREP attached the affidavit of one of its investors, David J. Lyon, manager of Krager Investments, LLC. (Lyon Aff., Ex. A to May 1, 2018 BREP Resp. in Opp. to Receiver Mot. on Taste Offer.) Lyon's affidavit indicated that BREP would not consider entering into a lease with Dioun or Dioun-related entities because the relationship between Dioun and the partners of BREP had soured. (Lyon Aff. at ¶ 8.) According to Lyon, BREP had entered a lease with LLJ Brewery Ltd. because it had a good relationship with the principles of LLJ Brewery Ltd. and was not interested in considering any other lease offers. *Id.* at ¶ 10, 13.

{¶ 18} Dioun filed a response in support of the receiver's motion and attached the affidavit of Mo Dioun. The affidavit indicated that Dioun negotiated the January 2013 lease amendment (allowing transfer without landlord approval to a party known to Jezerinac for more than three years) in order to ensure that if he or members of his family were to acquire control of BRC or BRLP the lease would be unaffected by the change in ownership. (Dioun Aff. at ¶ 3-4, Ex. C. attached to May 1, 2018 Dioun Memo in Support of Receiver Mot. on Taste Offer.) Dioun further swore that Taste was owned by his daughter, Sheila Trautner, who had been personally known to the Jezerinacs for more than three years. *Id.* at ¶ 5-6. Dioun averred that BREP indicated it was not interested in a lease relationship with any Dioun company and refused to discuss terms. *Id.* at ¶ 13-14. He also attested that BREP refused the purchase offer as below expectations but made no effort to convey its expectations. *Id.* at ¶ 13, 15.

{¶ 19} At about the same time as the briefing and filing of these affidavits, the trial court issued an order acknowledging that all discovery had been stayed during the life of the case except for certain documents provided to a forensic accountant. (May 9, 2018 Am. Order Modifying Stay at 1; Dec. 21, 2017 Order Modifying Stay at 1.) The trial court otherwise kept the stay intact for all purposes during the entire life of the case.

{¶ 20} After entertaining briefing on the offers by Dioun, BREP, Jezerinac, and several limited partners of BRLP, and based on documents and affidavits already discussed, the trial court issued a decision and entry on June 4, 2018 ordering the receiver to accept the LLJBucksBrew offer as the highest and best offer. (June 4, 2018 Decision & Entry.) The trial court reasoned that Barley's had not been offered for general sale and thus the only offers under consideration were the Taste offer and the LLJBucksBrew offer. *Id.* at 1. The court acknowledged that the Taste offer "maximize[d] the financial return from the property," yet found that the "key to th[e] case [wa]s the lease," because without premises, Barley's value was only the sum of its parts (which, all parties agreed, was worth far less than the business as a going concern). *Id.* at 2. The trial court acknowledged that another lawsuit was underway (seeking a declaration that the lease could be transferred) and that consolidation between the two cases was pending. *Id.* at 4; *see also* May 25, 2018 BREP Mot. to Consolidate (seeking to consolidate *Taste v. BREP*, Franklin C.P. No. 18CV-3879 with the case now being appealed, *Jezerinac v. Dioun*, Franklin C.P. No. 16CV-7939). Yet the trial court observed that it had already ruled on the lease transfer issue, declined to reconsider, and thereby found it had no obligation to resolve the consolidation issue before ruling. (June 4, 2018 Decision & Entry at 4.) It then found that it had no authority to force BREP to negotiate with Taste and that BREP had made it very clear that it had no wish to do business with any Dioun-related entity. *Id.*

{¶ 21} The trial court indicated that it had considered denying both offers and asking the receiver to advertise the business to the general market. *Id.* at 5. But it rejected this consideration because it believed any other party would end up in the same position as Taste—unable to enter a lease with BREP because BREP had already determined it wanted to do business with LLJBucksBrew and executed a binding lease. *Id.* It opined that in order to even negotiate with a third party, BREP would have to "get out of their agreement with LLJBucksBrew first." *Id.* at 5-6. It concluded that even if the lease problem were

solved, the "Court does not believe the new offer would generate enough cash to offset the additional costs the receiver and his attorney would accrue on their work advertising the sale and reviewing the additional bids." *Id.* at 6.

{¶ 22} The trial court's decision indicated that it was a final appealable order and that there was no just cause for delay. *Id.* Dioun now appeals. (June 14, 2018 Notice of Appeal.) The case, and execution of the trial court's decision, is stayed while this appeal is pending. (July 13, 2018 Entry, 18AP-479.)

## III.  ASSIGNMENTS OF ERROR

{¶ 23} Dioun presents three assignments of error for review:

> 1. The Trial Court erred in denying the Defendants-Appellants Mo and Mina Dioun's * * * requests to conduct discovery and in entering the July 19, 2017 *Order.*
>
> 2. The Trial Court erred in entering the August 24, 2017 *Decision and Entry Regarding Non-Party Brewery Real Estate Partnership's Motion for Leave and Associated Briefing.*
>
> 3. The Trial Court erred in entering the June 4, 2018 *Decision and Entry Denying the Motion of the Receiver to Accept Offer of Taste Hospitality* * * * .

(Emphasis sic.) (Footnote and citations omitted.) Because we see the pivotal issues in this appeal centering on the lease and how the trial court interpreted the lease in its August 24, 2017 decision and entry, we first review the second assignment of error.

## IV.  DISCUSSION

### A. Second Assignment of Error – Whether the Trial Court Erred in Interpreting the Lease Contract

{¶ 24} "We review the interpretation of a contract, a question of law, de novo." *Boone Coleman Constr., Inc. v. Piketon*, 145 Ohio St.3d 450, 2016-Ohio-628, ¶ 10, citing *Arnott v. Arnott*, 132 Ohio St.3d 401, 2012-Ohio-3208, ¶ 14. Neither discovery nor consideration of facts extraneous to the written document are generally necessary for this inquiry because, absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted, or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements. *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27 (2000), quoting 11 Williston on Contracts, Section 33:4, at 569-70, (4th Ed.1999); *see also Bellman v. Am. Interntl. Group*, 113 Ohio St.3d

323, 2007-Ohio-2071, ¶ 7.  Not only is a contract that appears to be a complete and unambiguous statement of the parties' contractual intent legally presumed to be integrated, but in this case, the lease contains an integration clause that the lease is the entire agreement between the parties.  (BRLP & BREP Lease at Art. XV(a).) *See also Bellman* at ¶ 11.  Clearly, our de novo analysis of the lease must be confined to what the written contract and its amendments say and mean and how our interpretation of them applies to what has happened between the parties and their constituent participants in this appeal.

### 1.  Whether the Receiver Can Assign the Lease

{¶ 25} "A receiver is an officer of the court and 'succeeds to the title and rights of action of the corporation itself, and takes all such rights as the corporation itself originally had, and may enforce them by the same legal remedies.' " *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, ¶ 53 (10th Dist.), quoting *Smith v. Johnson*, 57 Ohio St. 486, 488-89 (1898).  Dioun argues for an expansion of these rights based on cases sounding in bankruptcy law and argues that receiverships are essentially state law bankruptcies. (Dioun's Brief at 30-34.)  However, Ohio law permits receivers to be appointed for many reasons and this case, which concerns disentangling partners at severe odds with one another concerning each of their stakes in what appears to be a thriving business, is not best served by a bankruptcy analogy. R.C. 2735.01(A)(7).  We hold that the receiver in this case generally had the same rights and limitations as the tenant, BRLP, under the contract.

{¶ 26} The lease in question generally forbids transfers by the tenant (BRLP) and provides that transfers attempted "in violation" of that prohibition are "null and void." (BRLP & BREP Lease at 9.01.)  Yet, there is in the lease an exception to that general prohibition providing:

> The sale of * * * the partnership interests of [BRLP] * * * that results in the change of ownership control of [BRLP] shall be deemed a transfer of this Lease under this Subsection * * * and shall require the prior written approval of Landlord, which shall not be [un]reasonably withheld.
>
> * * *
>
> The foregoing sentence not withstanding, [sic] Landlord's approval is not required if the change of ownership control results from a transfer of stock or partnership interests owned by Lillian Jezerinac or Ronald Jezerinac to a person or persons

> personally known to them for a period of not less than three (3)
> years prior to such transfer.

(BRLP & BREP Lease at 9.01(a) & Jan 2, 2013 Amendment at 1.)

{¶ 27} Dioun's affidavit stated that Taste was owned by his daughter, Sheila Trautner, who had been personally known to the Jezerinacs for more than three years. (Dioun Aff. at ¶ 5-6.) None of the parties seems to dispute that the two families have known each other, regardless of circumstance, for many years. Jezerinac pled in the complaint, for example, "[i]n or about 2008, Ron Jezerinac and his late wife [Lillian Jezerinac] became personal friends with Mo and Mina Dioun." (Compl. at ¶ 33.) It also alleged that the Jezerinacs and the Diouns (which included Sheila and Adam Trautner) began a professional business relationship in 2011. *Id.* at ¶ 30, 37. The undisputed facts of this case and the plain language of the contract permit an assignment of the lease without the approval of the landlord if ownership control of BRLP is transferred to the Dioun family. (BRLP & BREP Lease at 9.01(a) & Jan 2, 2013 Amendment at 1.)

{¶ 28} The trial court erred when it found the lease could not be transferred in connection with a sale of Barley's, not having given effect to that portion of 9.01(a) of the lease as amended that provides for transfers in the event tenant (BRC) ownership changes. The trial court did not give effect to the language of the 2013 lease amendment permitting transfers without landlord approval if the transferee person was known to the Jezerinacs for more than three years. (Aug. 24, 2017 Decision & Entry at 2-3.) Under the plain language of the lease, the lease transfers incident to a sale of BRC and BRLP to any buyer who has been known to the Jezerinacs for more than three years or, with the approval BREP (which shall not be unreasonably withheld), to any buyer of BRC and BRLP regardless of whether that buyer has history with the Jezerinacs. We also disagree with the trial court's finding that BREP would have to "get out of their agreement with LLJBucksBrew first" in order to even negotiate with a third party. (June 4, 2018 Decision & Entry at 5-6.) BREP represented in its April 5, 2018 notice to the court that the purported lease with LLJBucksBrew would not become effective until after the lifting of the receivership stay and the only copy of the lease in evidence reflects that it is not fully executed. (BREP & LLJ Brewery Ltd. Lease at 15-16, Ex. B to Apr. 9, 2018 Receiver Mot. for Taste Purchase.)

### 2.  Whether BRLP is in Default Triggering a Right to Termination

{¶ 29}  The lease provided, that it is a default under the lease, "[i]f a receiver * * * shall be appointed * * * for Tenant[,] * * * and such receivership * * * shall not be set aside within thirty (30) days after such appointment."  (BRLP & BREP Lease at 11.01(c).)  In the event of such default, BREP is empowered to terminate the lease on ten days' notice to the tenant. *Id.* at 11.02(a).  The trial court found this provision to be valid and we have found no precedent, even persuasively, to suggest that it is not.  Yet when we read the provision in pari materia with the other default provisions of the lease and its amendments, we cannot so rigidly apply it as BREP does.

{¶ 30}  Most of the nine different subsections setting forth potential tenant defaults involve a situation where the tenant is bankrupt, vacates, or otherwise is in shaky financial condition to where it may be unable or unwilling to meet its financial obligations.  (BRLP & BREP Lease at 11.01(a-d, f, i).)  Of the remaining three default provisions, one concerns assignments without consent (already addressed), and the other two involve breaches that remain persistently uncured.  *Id.* at 11.01(e, g-h).  Just as bankruptcy law is inapposite to this particular receivership (*see supra at* ¶ 24), the creation of this receivership, while technically a default under the lease because "a receiver [has been] appointed under state law," is only a technical rather than substantive default because the appointment was not triggered by and does not impact BRLP's ability to meet its substantive obligations under the lease.  (BREP Lease with BRLP at 11.01(c).)  There is no allegation, for example, that Barley's has ceased to meet its financial and other substantive obligations as tenant in any other respect.  In that regard, we find this case to be analogous to *Takis, LLC v. C.D. Morelock Properties, Inc.*, where we reversed a trial court's mechanistic application of a termination clause based on relatively minor technical defaults and remanded for a weighing of the equities.  180 Ohio App.3d 243, 2008-Ohio-6676, ¶ 18-19 (10th Dist.).

{¶ 31}  In this case, like *Takis*, we find no dispute that BRLP has substantively met its responsibilities under the lease.  Nor do we find dispute that termination of the lease has the potential to work a hardship on BRLP, which has apparently invested significant resources in improving the premises. *See, e.g.,* Dec. 5, 2017 Hearing Tr. at 11-29 (discussing fact that Brewcadia was built shortly before the receivership and dealing with various costs relating to professional-grade water heaters for the establishment).  To further illustrate the potential for hardship, if the LLJBucksBrew offer were consummated, BRLP would

cease to exist, Dioun would receive $468,250 for his interest in BRC, less than the $475,000 Dioun initially invested in BRC in 2013. (Jezerinac's Brief at 4.) And only "certain" limited partners would be permitted to become limited partners of the new partnership under a new lease. Even those "certain" limited partners who would be allowed to remain involved with Barley's would be required to reinvest all unpaid past profit distributions and their payments of $18,750 per 1 percent of their interest in BRLP. (Feb. 1, 2018 Notice of LLJBucksBrew Purchase Offer at 1, 3.) In short, the LLJBucksBrew offer would destroy BRLP, squeeze Dioun (50 percent owner of the general partner, BRC) out of the business for a sum that is less than Dioun's initial investment, and either squeeze out the other limited partners or appropriate their past distributions as the price of remaining involved with Barley's.

{¶ 32} But we need not conclusively determine whether the equities such as in *Takis* permit BREP to terminate the lease based on the technical default that the parties (some of whom are partners of BREP) created when they successfully petitioned the court to appoint a receiver for BRLP. This is because the trial court stayed the running of business deadlines by agreement of the parties, and stayed the termination of the contract. (Nov. 29, 2016 Order at 1; Jan. 4, 2017 Order at 1; Aug. 24, 2017 Decision & Entry at 5-6.) While the trial court will doubtless lift the stay at some point, it need not do so until after the receiver has accepted and consummated an offer for Barley's. At that juncture, though the 30-day clock could start to run if the receivership for BRLP were still in existence, it is extremely conceivable that the receiver will no longer be needed for BRLP and that the receivership will be terminated.

### 3. Instructions on Remand

{¶ 33} Because we have determined that the lease is assignable under 9.01(a) and the January 2, 2013 lease amendment, we remand this matter to the trial court with instructions. We instruct that, under this section of the amended lease, the receiver should entertain offers from interested parties to whom the lease may be assigned <u>without</u> BREP's consent AND from interested parties to whom the lease may be assigned with BREP's consent (which shall not be unreasonably withheld), over a period not to exceed six months. The receiver should evaluate all offers and recommend acceptance of the highest and best offer. *See, e.g.*, *Yidi, L.L.C. v. JHB Hotel, L.L.C.*, 8th Dist. No. 104856, 2017-Ohio-1285, ¶ 19-28. The trial court, in deciding whether to accept the receiver's recommendation,

should also endeavor to identify the highest and best offer. *Id.* In keeping with the analysis of the lease in this decision, the trial court should not lift the stay on existing business and contract deadlines unless and until an offer has been accepted, has closed, and the receiver has relinquished control over the businesses that constitute Barley's (in whatever forms those take following the sale).

{¶ 34} Thus, in accordance with our decision on Dioun's second assignment of error, we sustain it.

### B. Third Assignment of Error – Whether the Trial Court Erred in Accepting the LLJBrewBucks Offer and Denying the Receiver's Motion to Accept the Taste Offer

{¶ 35} The trial court's decision to reject the Taste offer in favor of the LLJBrewBucks offer was based on its conclusion that the lease was not assignable. (June 4, 2018 Decision & Entry. at 2-6.) Because our de novo review of the contract language has yielded a different conclusion on this pivotal provision of the amended lease, the trial court's ruling rejecting the Taste offer is no longer apropos. We therefore also sustain Dioun's third assignment of error in that we agree that the trial court should not have ordered the receiver to accept the LLJBucksBrew offer over the Taste offer based on the perceived lease difficulties. The parties should not interpret the resolution of this assignment of error as this Court taking any position on whose offer the receiver and trial court should judge to be highest and best when considering the matter on remand.

### C. First Assignment of Error – Whether the Trial Court Erred in Failing to Permit Discovery

{¶ 36} Insofar as the purpose of this litigation has evolved into a receivership to disentangle the business partners, Dioun and Jezerinac, and effectuate a sale or transfer of Barley's that removes one or both of them from the governing structure, we see the case as one of contract interpretation (which is accomplished only by reference to the integrated contract) and weighing of competitive offers for purchase (which requires work by the receiver concerning offers from the interested parties). We do not find that the trial court has abused its discretion in staying discovery thus far. *See State ex rel. Ebbing v. Ricketts*, 133 Ohio St.3d 339, 2012-Ohio-4699, ¶ 19-21 (noting that whether to stay discovery pending resolution of dispositive issues that can be fairly resolved without discovery is within the discretion of the trial court and is reviewed for abuse of discretion.) (May 9, 2018 Am. Order Modifying Stay at 1; Dec. 21, 2017 Order Modifying Stay at 1.) In the event

the litigation evolves further, the trial court may need to revisit that decision. For now, however, we consider the argument that the trial court has denied all discovery in the case to be unripe. *See State ex rel. Elyria Foundry Co. v. Indus. Commn.*, 82 Ohio St.3d 88, 89 (1998).

## V. CONCLUSION

{¶ 37} Because the lease is assignable based on 9.01(a) and the January 2, 2013 amendment, we reverse the decision of the trial court finding otherwise and remand the matter to the trial court with instructions that the trial court receiver should entertain offers from interested parties to whom the lease may be assigned <u>without</u> BREP's consent AND from interested parties to whom the lease may be assigned with BREP's consent (which shall not be unreasonably withheld), all over a period not to exceed six months. The receiver should evaluate all offers and recommend acceptance of the highest and best offer.

{¶ 38} We also instruct that the trial court should not lift the stay on lease deadlines until an offer has been accepted, has closed, and the receiver has relinquished control over the businesses that constitute Barley's (in whatever forms those take following the sale). We sustain Dioun's second and third assignments of error and decline to address the first assignment of error on the grounds that it is unripe. Therefore, we reverse the judgment of the Franklin County Court of Common Pleas and remand with instructions.

*Judgment reversed and*
*remanded with instructions.*

HORTON, J., concurs.
KLATT, P.J., dissents.

KLATT, P.J., dissenting.

{¶ 39} Because I would affirm the trial court's decision, I respectfully dissent.

{¶ 40} Receivership proceedings are equitable in nature. *Heartland Bank v. LNG Resources, LLC*, 10th Dist. No. 08AP-410, 2008-Ohio-6226, ¶ 4. Moreover, the Supreme Court of Ohio has held that R.C. 2735.04, which sets forth the powers a trial court may grant to a receiver, is broad enough to enable "the trial court to exercise its sound judicial discretion to limit or expand a receiver's powers as it deems appropriate," subject to appellate review for abuse of discretion. *State ex rel. Celebrezze v. Gibbs*, 60 Ohio St.3d 69,

74 (1991). An abuse of discretion occurs where a trial court's decision is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 41} Here, the trial court reasonably balanced the interests of multiple parties in exercising its equitable powers. The trial court granted a receivership over a business tenant, BRLP, to effectuate its dissolution. The validity of the receivership is not contested. The lease between BRLP and its landlord was key to the trial court's analysis of the respective rights so as to effectuate an equitable dissolution of BRLP. The trial court rightfully considered the rights of the landlord, who was not even a party to the receivership proceeding, in exercising its discretion.

{¶ 42} The trial court recognized that both parties to the lease were sophisticated business entities. Under the express term of the lease, the appointment of a receiver for the tenant BRLP (lasting more than 30 days) is a default event that triggers the landlord's right to terminate the lease. The trial court expressly upheld the enforceability of this default provision. It is undisputed that the landlord sought to terminate the lease based upon that default event, and would have done so, except for the trial court's imposition of a stay to allow the parties time to negotiate an agreed resolution. When no agreement could be reached, the trial court recognized the landlord's termination of the lease based upon the undisputed default event, approved the sale of BRLP to LLJBucksBrew, and lifted the stay effective upon the closing of the sale. Therefore, the majority's reliance on the assignment provisions in the lease is misplaced. There simply is nothing to assign due to the landlord's exercise of its termination rights. The trial court did not abuse its discretion when it recognized these express contractual rights. Although the majority opinion acknowledges the default provision in the lease, the majority finds the provision unenforceable because it somehow deems the provision unfair. In essence, the majority simply substitutes its equitable judgment for that of the trial court without any recognition of the applicable standard of review.

{¶ 43} Lastly, the majority opinion's reliance on the trial court's stay order as the basis for avoiding the termination provision is also misplaced. The stay order was part of the trial court's exercise of its equitable powers. As noted above, the trial court lifted the stay in the context of its decision to recognize the landlord's termination of the lease and to

approve the sale of BRLP to LLJBucksBrew. The majority opinion's reliance on the stay order as the basis for avoiding the default provision turns equity on its head.

{¶ 44} The trial court did not abuse its discretion in finding that the default provision was enforceable and that the landlord exercised its right to terminate. Therefore, I agree with the trial court that Taste's purchase offer was patently not viable because it was conditioned upon acquiring the existing lease. I also fail to see how the trial court abused its discretion in directing the receiver to accept the only viable offer to acquire BRLP's assets and to enter into a new lease with the landlord so that the business could continue operating. Consequently, I would affirm the trial court's decision in all respects. Because the majority reaches a different conclusion, I respectfully dissent.

————————————