[Cite as *Jezerinac v. Dioun*, 2020-Ohio-587.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ronald M. Jezerinac et al., | : | |
| Plaintiffs-Appellees, | : | |
| | | No. 18AP-479 |
| v. | : | (C.P.C. No. 16CV-7939) |
| Mo M. Dioun et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellants. | : | |

D E C I S I O N

Rendered on February 20, 2020

*Hahn Loeser & Parks LLP*, *Marc J. Kessler*, and *Jordan D. Rauch*, for appellees Ronald M. Jezerinac and Tiffany Sexton.

*Allen Kuehnle Stovall & Neuman LLP*, *Todd H. Neuman*, *Rick L. Ashton*, and *Jeffrey R. Corcoran*; *David A. Kopech*, for appellants.

*Bailey Cavalieri, LLC, James G. Ryan, Timothy A. Riedel*, and *Matthew T. Schaeffer*, for intervenor-appellee Brewery Real Estate Partnership.

ON APPLICATION FOR RECONSIDERATION

KLATT, J.

{¶ 1} This case involves an appeal of three orders issued by the Franklin County Court of Common Pleas in connection with a receivership for a business that owns and operates a successful restaurant, pub, and classic arcade. The parties are joint owners of the business who had a falling out and were deadlocked on a number of significant management issues. That deadlock caused them to request the receivership. Essentially, the purpose of the receivership was to operate the business until the receiver could

effectuate a "business divorce" between the parties by an equitable and orderly sale of the business, with the goal of maintaining it as a going concern. One of the business's most valuable assets was its favorable long-term lease for its prime business location. Consequently, the lease and the contractual rights of the landlord became the focus of the trial court's evaluation of purchase offers. Defendants-appellants, Mo and Mina Dioun, challenged the trial court's rejection of one purchase offer and its approval of another purchase offer. In a two-to-one decision, this court in *Jezerinac v. Dioun*, 10th Dist. No. 18AP-479, 2019-Ohio-726 ("*Jezerinac I*"), reversed and remanded the judgment of the trial court.

## APPLICATION FOR RECONSIDERATION

{¶ 2} On March 11, 2019, plaintiffs-appellees, Ronald M. Jezerinac and Tiffany Sexton, filed an application for reconsideration of *Jezerinac I* pursuant to App.R. 26(A)(1). App.R. 26(A) provides a mechanism by which parties may prevent miscarriages of justice that could arise when an appellate court makes an obvious error or renders an unsupportable decision under the law. *State v. Harris*, 10th Dist. No. 13AP-1014, 2014-Ohio-672, ¶ 8. When presented with an application for reconsideration pursuant to App.R. 26(A)(1), an appellate court must determine whether the application calls to the court's attention an obvious error in its decision or raises an issue for consideration that was either not considered at all or was not fully considered by the court when it should have been. *Electronic Classroom of Tomorrow v. State Bd. of Edn.*, 10th Dist. No. 17AP-767, 2019-Ohio-1540, ¶ 3; *State v. Wade*, 10th Dist. No. 06AP-644, 2008-Ohio-1797, ¶ 2, *discretionary appeal not allowed*, 119 Ohio St.3d 1415, 2008-Ohio-3880, *cert. denied*, *Ohio v. Wade*, 555 U.S. 1126 (2009); *Matthews v. Matthews*, 5 Ohio App.3d 140 (10th Dist.1981). However, an application for reconsideration is not intended for instances where a party simply disagrees with the logic or conclusions of the court. *State v. Burk*, 10th Dist. No. 04AP-1234, 2006-Ohio-1026, ¶ 2. Furthermore, an application for reconsideration is not a means to raise new arguments or issues. *Electronic Classroom*, ¶ 3, citing *State v. Wellington*, 7th Dist. No. 14 MA 115, 2015-Ohio-2095, ¶ 9.

{¶ 3} In *Jezerinac I*, a majority of this court found that the trial court, in evaluating competing offers for the purchase of the tenant's business, committed an error of law when it recognized the enforceability of a default provision in a commercial lease between the

Brewpub Restaurant Limited Partnership ("tenant") and Brewery Real Estate Partnership ("landlord"). The tenant and its general partner, Brewpub Restaurant Corporation ("BRC"), were in receivership. Contrary to the trial court's finding, *Jezerinac I* viewed the appointment of a receiver for the tenant and BRC as a "technical rather than substantive default" of the lease that did not necessarily trigger the landlord's right to terminate the lease. *Jezerinac I* at ¶ 30-31. In any event, *Jezerinac I* found that no default event had occurred because the appointment of a receiver for the tenant and BRC constituted a default of the lease only if the receivership was not set aside within 30 days. According to *Jezerinac I*, the trial court stayed the running of this 30-day period, thereby avoiding a default event. *Id.* at ¶ 32. *Jezerinac I* also found the trial court committed an error of law when it found that the lease could not be assigned without the landlord's consent. Because it found that (1) no default event had occurred, (2) the landlord had no right to terminate the lease, and (3) the lease was assignable to certain parties without the landlord's consent (and to other parties with the landlord's consent which could not be unreasonably withheld), *Jezerinac I* reversed the trial court's judgment and remanded the case for consideration of purchase offers for the tenant's business from parties to whom the lease was potentially assignable.

{¶ 4} In their application for reconsideration, the appellees make a number of interrelated arguments for why *Jezerinac I* contains obvious errors and should be reconsidered by this court. Appellees argue that *Jezerinac I* (1) applied the wrong standard of review; (2) refused to enforce unambiguous lease terms; (3) misinterpreted and/or ignored the scope of the trial court's stay orders; (4) failed to recognize that the tenant no longer has a general partner; and (5) issued instructions on remand that cannot be implemented under the terms of the operative agreements. For the reasons set forth below, we agree with appellees that *Jezerinac I* contains obvious errors. However, before addressing the substantive grounds for our reconsideration of *Jezerinac I*, we must address two collateral issues raised by the parties.

**ALLEGED JUDICIAL CONFLICT**

{¶ 5} Although not technically raised as a ground for reconsideration, appellees challenge the impartiality of a former judge of this court (Judge Horton) and a current member of this panel (Judge Brunner) who comprised the majority decision in *Jezerinac I*. Although their theory is not entirely clear, appellees state that "there is an inescapable

appearance of impropriety that cannot be cured as he [Judge Horton] was represented by a fellow panelist's [Judge Brunner's] husband throughout his disciplinary proceedings." (Appellees' Application for Recons. at 9-10.)  This argument is baseless.

{¶ 6}    As previously noted, an application for reconsideration is not an appropriate vehicle to raise new arguments or issues.  *Electronic Classroom* at ¶ 3.  The disciplinary charges against Judge Horton were widely publicized long before this case was briefed, argued, and decided by the original panel and no party challenged Judge Horton's or Judge Brunner's ability to fairly and objectively participate as judges on the original panel.  If appellees had concerns about their ability to sit on this case during the adjudication of Judge Horton's disciplinary charges, they could have raised it.  Appellees cannot wait until they receive an adverse judgment to raise a disqualification issue.  *State v. Castile*, 10th Dist. No. 13AP-10, 2014-Ohio-1918, ¶ 13 ("party may be considered to have waived its objection to the judge when the objection is not raised in timely fashion and the facts underlying the objection have been known to the party for some time").  *Calypso Asset Mgt., LLC v. 180 Industrial, LLC*, 10th Dist. No. 18AP-53 (Feb. 5, 2019) (memorandum decision) ("A request for disqualification, post-judgment, is inappropriate.").

{¶ 7}    Appellees do not articulate what appearance of impropriety or conflict of interest is created, or what provisions of the code of judicial conduct are somehow implicated, by Judge Brunner's husband representing Judge Horton in Judge Horton's disciplinary proceedings.  The conduct giving rise to those disciplinary proceedings had nothing to do with this appeal or with the exercise of Judge Horton's or Judge Brunner's judicial responsibilities as appellate judges.  We emphatically reject appellees' assertion that the participation of Judge Brunner and Judge Horton on the original panel was in any way improper.

## PARTICIPATION OF NEW PANEL MEMBER

{¶ 8}    Appellants take exception to Judge Horton's successor participating in this decision following Judge Horton's resignation from this court.  Appellants' contention that App.R. 26(A)(1)(c) precludes a judge who was not on the original panel, but was subsequently appointed or elected to replace a panel member, from participating in the decision on an application for reconsideration is mistaken and contrary to long-standing precedent and practice.  When a judge is replaced on a panel, the successor judge has the

same responsibilities as his or her predecessor. *Holland v. State*, 27 Ohio St.2d 77, 78 (1971) ("[t]he judicial power of a member of the Court of Appeals is not personal to him [or her] and may be exercised by another member of the Court of Appeals"); *see also State ex rel. Yost v. Omar Ibn El Khattab Mosque, Inc.*, 156 Ohio St.3d 523, 2019-Ohio-1958 (two newly elected justices participating in decision on motion for reconsideration in place of former justices); *State v. Brandon*, ___ Ohio St. ___ 2019-Ohio-4204 (same); *State v. Gonzales*, 150 Ohio St.3d 276, 2017-Ohio-777 (same). Therefore, Judge Nelson, who was appointed to this court following Judge Horton's resignation, is authorized to participate in the reconsideration of *Jezerinac I*.

## NATURE OF THE DISPUTE AND PROCEDURAL HISTORY

{¶ 9} In order to understand the substantive issues raised in the application for reconsideration and the obvious errors contained in *Jezerinac I*, it is necessary to identify the various parties, summarize the nature of the dispute, and set forth the procedural history of the case. "Barley's" (comprising Barley's Brewing Company and Brewcadia) is a restaurant, pub, and classic videogame arcade located at 467 North High Street, Columbus, Ohio. Barley's is owned by the tenant. The tenant is comprised of a number of limited partner investors and one general partner, BRC, which owns 50 percent of the tenant. Appellee, Ron Jezerinac, owns a one-half interest in BRC and appellant, Mo Dioun, owns the other one-half interest. As the tenant's general partner, BRC operated Barley's. Pursuant to a written lease, the tenant rents its business premises at 467 North High Street from the landlord, which owns the building. The landlord is owned by some of the same persons/entities who are limited partners in the tenant, including appellee Jezerinac. However, appellee Jezerinac does not own a controlling interest in the landlord. Appellants have no ownership interest in the landlord. One of the tenant's most valuable assets is the long-term lease for its prime location.

{¶ 10} Appellants and appellees had a falling out over the management of Barley's and a number of jointly owned real estate properties. The parties were deadlocked on a number of significant management issues. That deadlock ultimately resulted in litigation. On August 23, 2016, appellees, in their individual capacities and derivatively as interest holders in various businesses, sued appellants and appellants' daughter and son-in-law, Adam and Sheila Trautner, as well as various jointly owned business entities. The

complaint accused appellants of various business betrayals including commingling of funds, misappropriation and conversion of corporate assets, and disruption of business operations. The complaint contemplated the appointment of a receiver for the parties' jointly owned businesses, including BRC, pending dissolution of those entities.

{¶ 11} Appellants answered the complaint and filed a verified counterclaim accusing appellees of financial betrayals and of attempting to squeeze appellants out of various jointly owned business entities. The counterclaim included claims for breach of fiduciary duty, conversion, breach of contract, unjust enrichment, tortious inference with business relations, violations of R.C. 2921.13, and civil conspiracy. Among other claims for relief, appellants expressly requested the appointment of a receiver for BRC, the tenant's general partner, pursuant to R.C. 2735.01(A)(7), to "establish a fair and equitable procedure for the orderly sale of its principal asset, its ownership interests in [the tenant]." (Oct. 17, 2016 Defs. Countercl. at ¶ 172.) Neither appellants nor appellees sued the landlord.

{¶ 12} Pursuant to a joint motion of the parties, the trial court stayed the case to allow the parties time to mediate their dispute. Among other collateral issues such as discovery, the trial court expressly stayed "[t]he time frames relating to underlying businesses, including but not limited to [the tenant] and the potential withdrawal of a general partner [BRC] and dissolution found in R.C. § 1782.01 et seq. and [the tenant's] Partnership Agreement, if applicable." (Nov. 29, 2016 Order at 1.) When mediation was unsuccessful, appellants filed a motion to reactivate the case. The trial court granted the motion, but continued the stay under the same terms as set forth in its November 29, 2016 order. (Jan. 4, 2017 Order.)

{¶ 13} Shortly thereafter, both appellants and appellees separately moved for the appointment of a receiver for BRC, the tenant, and other entities related to their joint real estate holdings pursuant to R.C. 2735.01(A)(7).[1] Appellants sought the appointment of a receiver for BRC to, among other tasks, manage BRC and its assets, including the tenant, in order to formulate and implement a bidding process to monetize Barley's through either a competitive bidding process or some other method to separate the parties' joint interests. Appellees sought the appointment of a receiver for BRC and the tenant but pointed out that

---

[1] Appellants did not request the appointment of a receiver for the tenant.

under the tenant's limited partnership agreement, the parties' request for the appointment of a receiver for BRC trigged the withdrawal of BRC as the tenant's general partner and the dissolution of the tenant. The trial court conducted a receivership hearing on March 6, 2017. Pursuant to requests by a number of the tenant's limited partners, the trial court permitted their participation in the hearing.

{¶ 14} In a decision and entry dated March 10, 2017, the trial court appointed a receiver for BRC and the tenant "for the purpose of protecting and preserving, managing and operating, and collecting the necessary profits of * * * [BRC and tenant] during the pending of this action." The trial court also found that under Section 9 of the tenant's limited partnership agreement, BRC ceased being the general partner of the tenant based upon the parties' joint request for the appointment of a receiver for BRC. (Mar. 10, 2017 Decision & Entry at 5-6.) It also continued the stay of business deadlines in the operative agreements between appellants and appellees. The trial court's grant of a receivership for BRC and the tenant was not appealed. The orders at issue in this appeal all arise out of the trial court's subsequent receivership proceedings. The other claims and counterclaims filed in the case remain pending and are not at issue in this appeal.

{¶ 15} On June 15, 2017, the landlord filed a motion to intervene in the action and also requested leave to terminate its lease with the tenant. The lease explicitly provides that it is an event of default "[i]f a receiver * * * shall be appointed under state law for Tenant * * * and such receivership * * * shall not be set aside within thirty (30) days after such appointment." (Lease Agreement at Section 11.01(c).) Moreover, "[s]hould a Default occur * * * Landlord may terminate [the] Lease by giving ten (10) days written notice of such termination to Tenant, whereupon [the] Lease shall automatically cease and terminate and Tenant shall be  immediately obligated to quit the Demised Premises." *Id.* at Sections 11.02 and 11.02(a). Because the trial court appointed a receiver for the tenant, and the receivership was not set aside within 30 days, the landlord sought to exercise its right of termination.

{¶ 16} Pursuant to a status conference held on July 12, 2017, the trial court required the parties to brief two questions:

> (1) May the receiver assign [the lease] to a third party or may the landlord terminate the lease with its tenant?

(2) Does the court have the power to stay/enjoin any action regarding said lease termination and/or assignment?

The trial court continued a previously imposed stay of discovery pending its resolution of these questions. (July 19, 2017 Order.)

{¶ 17} The trial court answered both of these questions in a decision and entry dated August 24, 2017. The trial court found that the receiver lacked the power to assign the lease without the landlord's consent. (Aug. 24, 2017 Order at 3.) It rejected appellants' argument that the default provision set forth in section 11.01 of the lease was inequitable and unenforceable. Instead, it found that the landlord and tenant, both sophisticated parties, entered into the lease with equal bargaining power and that the tenant and BRC had the opportunity to cure the default and failed to do so. *Id.* at 5. Lastly, the trial court found that the default resulting from the appointment of a receiver for the tenant triggered the landlord's right to terminate the lease. *Id.* However, with the agreement of the parties, the trial court temporarily stayed the landlord's right to terminate the lease "until both the Receiver and the Court have a better understanding of the issues and facts surrounding this case." *Id.* at 6. Although the trial court temporarily stayed the landlord's right to terminate the lease, it recognized that the lease was in default due to the appointment of a receiver for the tenant lasting more than 30 days.

{¶ 18} Following the trial court's August 24, 2017 decision, an entity affiliated with appellants, the Stonehenge Company ("Stonehenge"), presented the receiver with an offer to purchase BRC's interest in the tenant. The Stonehenge offer was contingent on its ability to operate Barley's under the existing lease. Appellees and the landlord objected to the offer principally on the ground that the lease was in default and the landlord intended to terminate it. The trial court held a hearing concerning the offer on December 5, 2017. The trial court orally agreed that the offer was not viable until the "lease problem [wa]s solved." (Dec. 5, 2017 Hearing Tr. at 79.) It appears that neither the receiver nor the parties pursued the Stonehenge offer.

{¶ 19} In early April 2018, the receiver sent notice to the parties that he had received competing offers for the purchase of Barley's. One was from an entity affiliated with appellees, LLJBucksBrew, LLC ("LLJ"). The other was from an entity affiliated with appellants, Taste Hospitality Group Ltd. ("Taste"). Based on his determination that the

Taste offer was worth more to the receivership estate than the LLJ offer, the receiver indicated his intent to accept, with court approval, the Taste offer subject to Taste's satisfaction of two conditions: (1) that Taste offer proof of financial ability to close; and (2) that Taste provide evidence of its ability to enter into a binding lease with the landlord for Barley's business premises. The receiver also indicated that he would entertain a new or revised offer from LLJ or any other entity that might offer more value. Shortly thereafter, the landlord filed notice with the court that it had entered into a lease agreement with LLJ for Barley's business premises to take effect whenever the court lifted the stay to allow it to terminate the existing lease with the tenant. On April 9, 2018, the receiver filed a motion with the trial court asking the court to approve Taste's offer contingent on its satisfaction of the two conditions noted above.

{¶ 20} On April 10, 2018, the trial court held a hearing to consider the competing offers to purchase Barley's and the receiver's motion. The parties also filed briefs with supporting affidavits. Evidence was presented indicating that the landlord would not enter into a new lease agreement with Taste or with any entity affiliated with appellants because the relationship between appellants and the landlord had soured. Nor would the landlord approve an assignment of the tenant's existing lease to Taste or to any entity affiliated with appellants. The landlord also indicated it had entered into a lease with LLJ for Barley's business premises because it had a good relationship with LLJ's owners and because the landlord was not interested in considering any other lease offers.

{¶ 21} After further briefing by the parties explaining the terms and merits of the competing offers, the trial court issued a decision and entry on June 4, 2018. The trial court acknowledged that the Taste offer was higher than the LLJ offer. Nevertheless, the trial court found that the Taste offer "[wa]s not viable given the lease problem alone." (June 4, 2018 Decision and Order at 6.) It further found that the LLJ offer was "a very viable offer" that "pays all the bills, includes a significant cash distribution to the general partners, and allows for the restaurant to be sold as a going-concern." *Id.* In addition, the trial court noted that LLJ had already executed an agreement with the landlord to lease Barley's business premises commencing upon the trial court's approval of the LLJ offer and its lifting of the stay of the landlord's right to terminate the existing lease. The trial court emphasized the significance of the lease in assessing the merits of the competing offers.

> Yet, the key to this case is the lease. Without the lease, which is controlled by the landlord * * *, the best that can happen is the selling of the assets of [the tenant] piecemeal. No one has argued that selling [the tenant] in parts could return more money than either offer currently on the table. Accordingly, the Court must review all bids based not only on the criteria of highest, but what offer would be the best for the Barley's company.
>
> [LLJ] puts forth evidence of a contract with [the landlord] for a lease agreement * * *. Under the agreement, [the landlord] agrees to lease the premises to [LLJ] * * * for a period of five years, with an option to renew. [LLJ] has negotiated and signed the lease with [the landlord] to commence upon the approval of the court and lift [sic] of the current stay. Accordingly, [LLJ] has solved the issue of the lease and puts forth a bid that allows the sale of Barley's as a going-concern.

(June 4, 2018 Decision & Order at 2-3.)

{¶ 22} Therefore, the trial court, exercising its equitable powers in receivership, approved the sale of Barley's to LLJ. To effectuate that sale, the trial court lifted the stay on the landlord's right to terminate the existing lease effective upon the closing of the sale of Barley's and the execution of the new lease for the business premises. *Id.*

**OBVIOUS ERRORS IN *JEZERINAC I***

{¶ 23} The flaws in the analysis advanced in *Jezerinac I* stem from four obvious errors. First, *Jezerinac I* mistakenly determined that the trial court had stayed the running of the 30-day period following the appointment of a receiver for the tenant to avoid a default event under the lease. *Jezerinac I* at ¶ 32. None of the trial court's stay orders support this conclusion.

{¶ 24} The trial court placed BRC and the tenant in receivership to resolve a control dispute and a management deadlock between the joint owners of Barley's as well as certain jointly owned real estate properties. The trial court's November 29, 2016 and January 4, 2017 orders, on which *Jezerinac I* relies in part, stay only the "time frames relating to underling [sic] businesses, including but not limited to [the tenant] and the potential withdrawal of a general partner [BRC] and dissolution found in § R.C. 1782.01 et seq. and [the tenant's] Partnership Agreement." The record demonstrates that the purpose of these orders was to stay the running of time frames in the operative agreements between

appellants and appellees, particularly those time frames that triggered certain consequences associated with the potential withdrawal of BRC as general partner of the tenant, including the dissolution of the tenant pursuant to provisions in the tenant's partnership agreement. These stay orders did not reach the landlord or the lease because the landlord was not a jointly owned business of the parties. Appellants have no ownership interest in the landlord and appellee, Ron Jezerinac, who owns only a minority interest. Moreover, the landlord–the entity seeking to terminate the lease–was not a party to and had not appeared in the action when the stay issued on November 29, 2016 or when it was extended by the orders of January 4, 2017 and March 10, 2017.

{¶ 25} This obvious error in *Jezerinac I* is even more apparent in light of the trial court's decision and entry of August 24, 2017. In that decision, the trial court expressly rejected appellants' argument that the default provision in the lease was unenforceable. However, with the parties' agreement, the trial court stayed the landlord's right to terminate the lease. *Jezerinac I* confuses a default event under the lease (pursuant to Section 11.01(c)) with the landlord's resulting right of termination (on ten days' notice pursuant to Section 11.02(a)). Unless there was an existing default, there would be no need to stay the landlord's right to terminate the lease–a right that arises only if a default occurs. The trial court's decision and entry of June 4, 2018 is also premised on an existing default. Therefore, the conclusion in *Jezerinac I* that the lease was not in default due to the trial court's stay orders is an obvious error.

{¶ 26} Second, by mistakenly focusing on several assignment provisions in the lease that the trial court supposedly misinterpreted, *Jezerinac I* failed to recognize that regardless of whether the lease was potentially assignable, the lease was already in default, and therefore, already subject to termination by the landlord on ten days' notice. Therefore, unless the landlord waived its termination right, or the trial court found that right unenforceable, any potential assignment, even if authorized by the lease, would be meaningless. The landlord had already filed a motion requesting leave to terminate the lease. It had already entered into a new lease with LLJ for Barley's business premises. In addition, the trial court expressly found that the default and termination provisions in the tenant's lease were enforceable. Consequently, *Jezerinac I*'s focus on the assignment provisions in the lease as a basis for reversing the trial court's judgment is an obvious error.

{¶ 27} Third, the suggestion in *Jezerinac I* that the appointment of a receiver for the tenant was a "technical rather than a substantive default" of the lease is also an obvious error. *Jezerinac I* at ¶ 30. The parties to the lease had expressly contemplated that if a receiver was appointed for the tenant and the receivership was not "set aside within thirty (30) days after such appointment," that circumstance would be a default. (Lease Agreement at Section 11.01(c).) There is no legitimate basis for concluding that the appointment of a receiver for the tenant to effectuate the sale of its business is a technical rather than a substantive default of the tenant's long-term commercial lease. The appointment of the receiver for the tenant essentially changed the party with whom the landlord had a contract and the sale of the tenant's business destroyed the purpose of the lease. To suggest that such a change is not a substantive default is clearly erroneous.

{¶ 28} Lastly, *Jezerinac I* failed to apply the correct standard of review in assessing the trial court's exercise of its equitable authority in receivership. Receivership proceedings are equitable in nature subject to appellate review for abuse of discretion. Yet, *Jezerinac I* applied a de novo standard of review to substitute this court's equitable judgment for that of the trial court even absent an abuse of discretion. This is also an obvious error. The lease agreement provisions *Jezerinac I* purported to interpret were beside the point because even if the lease could have been assigned, the landlord still would have the right to terminate it based on the preexisting default. An assignor can assign only the rights it possesses: assignment of a lease that a landlord will terminate upon ten days' notice when the stay is lifted or with the end of the case is of no value.

{¶ 29} Because these fundamental errors led to the flawed analysis in *Jezerinac I*, we grant appellees' application for reconsideration and vacate *Jezerinac I*.

**ASSIGNMENTS OF ERROR**

> 1. The Trial Court erred in denying the Defendants-Appellants Mo and Mina Dioun's * * * requests to conduct discovery and in entering the July 19, 2017 order.
>
> 2. The Trial Court erred in entering the August 24, 2017 Decision and Entry Regarding Non-Party Brewery Real Estate Partnership's Motion for Leave and Associated Briefing.
>
> 3. The Trial Court erred in entering the June 4, 2018 Decision and Entry Denying the Motion of the Receiver to Accept Offer of Taste Hospitality, LLC, for Purchase of BRLP, filed April 9,

2018; Denying Defendants' Mo M. Dioun and Mina L. Dioun's Motion to Strike, filed May 10, 2018; and Granting Brewery Real Estate Partnership's Motion to Lift the Receivership Stay with Respect to its Lease with Brewpub Restaurant Limited Partnership, filed May 21, 2018.

## LEGAL ANALYSIS

{¶ 30} In their first assignment of error, appellants contend that the trial court erred in denying their "requests to conduct discovery and in entering the July 19, 2017 order." In that order, the trial court stayed discovery pending the trial court's resolution of two legal issues associated with the default, termination, and assignment provisions in the lease, including the question of whether the trial court had the power "to stay/enjoin any action regarding said lease termination and/or assignment." Given that these issues were legal in nature, the trial court continued its previously imposed stay of discovery until it resolved the pending legal questions. Appellants argue that the trial court abused its discretion when it entered this order. We disagree.

{¶ 31} A trial court has the inherent power to manage discovery in cases pending before it. Discovery orders are reviewed under an abuse of discretion standard of review. *Bay Emm Vay Store, Inc. v. BMW Fin. Servs. NA, L.L.C.*, 10th Dist. No. 17AP-786, 2018-Ohio-2736, ¶ 11 ("We apply an abuse of discretion standard to review a trial court's discovery rulings."). *Heinrichs v. 356 Registry, Inc.*, 10th Dist. No. 15AP-532, 2016-Ohio-4646, ¶ 47. A decision staying discovery pending the resolution of a specific issue is not to be disturbed absent an abuse of discretion. *State ex rel. DeWine v. Helms*, 9th Dist. No. 28304, 2017-Ohio-7148, ¶ 13. Under an abuse of discretion standard of review, an appellate court can reverse a trial court decision only when the decision is unreasonable, arbitrary, or unconscionable. *State ex rel. Worrell v. Ohio Police & Fire Pension Fund*, 112 Ohio St.3d 116, 2006-Ohio-6513, ¶ 10; *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 32} Appellants argue that the trial court abused its discretion in staying discovery because the trial court could not properly interpret the default, termination, and assignment provisions of the lease (which the trial court addressed in its August 24, 2017 decision and entry) without considering certain facts such as (1) the overlap in ownership between the tenant, landlord, and a potential purchaser; (2) appellees' motivation for their business decisions; and (3) the parties' subjective understanding of certain lease provisions.

(Appellants' Brief at 19.)  Appellants contend they should have been permitted to conduct discovery on these issues.  Because the trial court interpreted the lease terms as a matter of law, we fail to see how the trial court abused its discretion by staying discovery.

{¶ 33}  "The interpretation of a written contract is, in the first instance, a matter of law for the court." *Columbus Countywide Dev. Corp. v. Junior Village of Dublin, Inc.*, 10th Dist. No. 03AP-73, 2003-Ohio-5447, ¶ 19.  When construing the terms of a contract, a court's principal objective is to determine the intent of the parties.  *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Co.*, 86 Ohio St.3d 270, 273 (1999).  A court must presume that the intent of the parties resides in the language that they used in the contract.  *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus.  If a court is able to determine the intent of the parties from the plain language of the contract, then the court must apply the language as written and refrain from further contract interpretation.  *St. Mary's v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 18; *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, ¶ 9.  When " 'the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.' "  *Holdeman v. Epperson*, 111 Ohio St.3d 551, 2006-Ohio-6209, ¶ 12, quoting *Shifrin v. Forest City Ents., Inc.* 64 Ohio St.3d 635, 638 (1992).  Moreover, parties may not introduce extrinsic evidence to show an agreement that is materially different from the agreement expressed by the unambiguous contractual language.  *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm.*, 129 Ohio St.3d 485, 2011-Ohio-4189, ¶ 22.  Leases are contracts and are subject to the traditional rules of contract interpretation.  *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.*, 156 Ohio App.3d 65, 2004-Ohio-411, ¶ 29 (4th Dist.).

{¶ 34}  The legal issues resolved by the trial court in its August 24, 2017 decision and entry were narrow in scope, were legal in nature, and did not require an analysis of any disputed facts.  The trial court examined the default, termination, and assignment provisions in the lease and determined that the provisions were clear and unambiguous. (Aug. 24, 2017 Decision & Entry at 2.)  Based upon these lease provisions, the trial court determined that the appointment of a receiver for the tenant was a default event under the lease that triggered the landlord's right to terminate the lease on ten days' notice.  The trial court also found that the tenant could not assign the lease without the landlord's consent.

None of the discovery appellants contend they wanted to conduct is relevant to the trial court's analysis of the unambiguous lease terms.

{¶ 35} Although not parties to the lease, appellants also argue that they should have been permitted to conduct discovery on "other issues related to whether termination or assignment of Lease would be equitable." (Appellants' Brief at 19.) The trial court found no unfairness in enforcing the default and termination provisions of the lease. It reached this conclusion based on two uncontested facts: (1) the parties to the lease were sophisticated business entities of equal bargaining power; and (2) the tenant and BRC had the opportunity to cure the default and failed to do so. (Aug. 24, 2017 Decision & Entry at 5.) Again, none of the potential discovery appellants identify is relevant to the fairness of enforcing the unambiguous lease terms between the contracting parties.

{¶ 36} Appellants make essentially the same arguments with respect to the trial court's June 4, 2018 decision. That decision was limited to the trial court's assessment of competing offers for the purchase of Barley's as a going concern. The parties extensively briefed the nature and merits of the competing offers. Again, none of the potential discovery appellants identify is relevant to the trial court's assessment of the competing offers.

{¶ 37} For these reasons, we find the trial court did not abuse its discretion in entering the July 19, 2017 order or in staying discovery pending its resolution of the issues addressed in its August 24, 2017 and June 4, 2018 decisions. Accordingly, we overrule appellants' first assignment of error.

{¶ 38} In its second assignment of error, appellants contend the trial court erred in entering its August 24, 2017 decision and entry. This is the decision and entry in which the trial court resolved the default, termination, and assignment issues under the lease. Appellants argue the trial court erred when it enforced the default and termination provisions in the lease and erred in interpreting the assignment provisions. Again, as to the issues material here, we disagree.

{¶ 39} We note that appellants do not challenge the trial court's interpretation of the default and termination provisions of the lease. Rather, they challenge the fairness of the trial court's enforcement of those provisions. We review the trial court's decision to enforce the default and termination provisions of the lease under an abuse of discretion standard

of review. *Joseph J. Freed & Assocs., Inc. v. Cassinelli Apparel Corp.*, 23 Ohio St.3d 94, 97 (1986).

{¶ 40} Appellants make two arguments in support of their contention that enforcing the default provision is unfair. First, appellants argue that the trial court should not have enforced the default provision because some of the landlord's owners ("the Jezerinac collaborators") caused the default by requesting the appointment of a receiver, and therefore, the appellees have "unclean hands."

{¶ 41} Especially given that appellants also sought the appointment of a receiver, appellants' argument rings hollow. Although appellees own a non-controlling interest in the landlord, the landlord is a separate legal entity with clear rights under the lease. The landlord did nothing to cause the trial court to appoint a receiver for BRC and the tenant. Nor is the landlord even a party in the receivership proceeding. The trial court appropriately considered the contractual rights of the landlord and the landlord's interests as the owners of Barley's business premises. The trial court did not abuse its discretion when it enforced the default provision.

{¶ 42} Second, relying principally on bankruptcy law, appellants argue that the default provision is an unenforceable "*ipso facto* clause." Appellants point to similarities between a bankruptcy proceeding and a receivership proceeding in arguing that the trial court abused its discretion by enforcing the default provision. Again, we see no basis for finding that the trial court abused its discretion.

{¶ 43} The trial court noted the differences between a business in danger of insolvency seeking bankruptcy protection (with the need to protect the rights of creditors) and a receivership proceeding that seeks dissolution to monetize and separate the ownership interests of a thriving business paralyzed by a management deadlock, while still allowing the business to continue. The trial court expressly balanced the equities, noting that the dispute involves sophisticated parties of equal bargaining power and that the default could have been cured. Nothing in the trial court's August 24, 2017 decision suggests that it acted in an unreasonable, arbitrary, or capricious manner by enforcing the default provision.

{¶ 44} For the same reasons, we conclude that the trial court did not abuse its discretion by enforcing the termination provision in the lease. Appellants cite to *Takis, LLC*

*v. C.D. Morelock Properties, Inc.*, 180 Ohio App.3d 243, 250-51 (10th Dist.2008) in support of their argument that it is unfair to enforce the termination provisions. In *Takis*, this court reversed the trial court's finding that a landlord could terminate a lease because the trial court *failed* to weigh the equities, particularly when the default events were very minor. Unlike *Takis*, the trial court here expressly considered the equities in enforcing the termination provision. Moreover, the trial court recognized that the appointment of a receiver for a tenant to effectuate the sale of its business is a significant substantive default of a long-term commercial lease. Therefore, *Takis* lends no support to appellants' argument.

{¶ 45} Lastly, appellants make a number of arguments in support of their contention that the trial court erred in its interpretation of various assignment provisions in the lease and in its conclusion that the lease could not be assigned without the landlord's consent. The potential assignability of the lease without the landlord's consent is a "red-herring." This issue is moot given the trial court's enforcement of the default and termination provisions and the landlord's clear intent to terminate the lease.

{¶ 46} Because the lease was in default, the landlord had the right to terminate it on ten days' notice. We have already found that the trial court did not abuse its discretion by enforcing the default and termination provisions. The landlord sought leave to terminate the lease, and would have done so, but for the trial court's stay pending its evaluation of options to effectuate the business divorce of the parties. Therefore, even if the receiver could have assigned the lease to Taste or to another potential buyer without the landlord's consent (contrary to the trial court's finding), the assignee would have received only a lease in default, subject to promised termination. The landlord made it clear to the trial court that it intended to terminate the lease based on the existing default and that it would not do business with appellants, or with any entity affiliated with appellants, including Taste. The landlord also indicated to the trial court that it had already entered into a new agreement to lease Barley's business premises to LLJ commencing on the trial court's approval of the LLJ purchase offer and the lifting of the stay. Consequently, appellants' arguments regarding the assignability of the lease without the landlord's consent are of no consequence and we need not address them.

{¶ 47} For all these reasons, we overrule appellants' second assignment of error.

{¶ 48} In its third and final assignment of error, appellants contend that the trial court erred in entering its order of June 4, 2018. In that order, the trial court evaluated competing offers from Taste and LLJ and concluded that (1) the Taste offer was not viable "given the lease problem" and (2) the LLJ offer was a very viable offer given that it "pays all the bills, includes a significant cash distribution to the general partners, and allows for the restaurant to be sold as a going-concern." (June 4, 2018 Order at 6.) The trial court reached these conclusions after extensive briefing by the parties, certain limited partners, and the landlord. These briefs described the nature and relative merits of the competing offers in significant detail. The trial court also had the benefit of affidavits submitted with some of the briefs as well as the receiver's conditioned recommendation.

{¶ 49} Receivership proceedings are equitable in nature. *Heartland Bank v. LNG Resources, LLC*, 10th Dist. No. 08AP-410, 2008-Ohio-6226, ¶ 4. Trial court decisions involving the disposition of receivership property are reviewed under an abuse of discretion standard. *Wells Fargo Bank N.A. v. Odita*, 10th Dist. No. 13AP-663, 2014-Ohio-2540, ¶ 15; *Golick v. Golick*, 9 Ohio App.3d 106, 108 (8th Dist.1983).

{¶ 50} The trial court's June 4, 2018 order reflects a detailed and thoughtful analysis supporting its conclusion that LLJ made the best offer. A trial court weighed the financial aspects of the competing offers, noting that the limited partners would receive substantially similar financial payouts from both bids pending before the receiver. Given the existing default and the landlord's exercise of its termination rights, the trial court concluded that Taste's offer, which was contingent on acquiring the existing lease or executing a new lease with the landlord, was not viable. Nor could the trial court compel the landlord, a non-party to the receivership proceeding, to enter into a new lease with Taste. The trial court also noted that the limited partners of the tenant, like the landlord, did not want to continue in business with appellants or with any entity affiliated with appellants.

{¶ 51} Turning to the merits of the LLJ offer, the trial court recognized that the landlord had already agreed to lease the business premises to LLJ for a period of five years with an option to renew. Thus, Barley's would be sold as a going concern, which was one of the trial court's main objectives to maximize value for the parties and the limited partners, but still effectuate the business divorce that was the central purpose of the receivership. The trial court also noted that if Barley's was not sold as a going concern, the

alternative was a piecemeal sale of its assets that would result in proceeds less than either of the competing offers. Given the trial court's careful analysis of the competing offers, and its recognition that Barley's existing lease was in default and would be terminated, the trial court did not abuse its discretion in finding that LLJ made the best offer.

{¶ 52} Appellants also argue that the trial court abused its discretion when it rejected appellants' request that the court order the receiver to advertise Barley's to see what additional offers might surface. For the reasons given by the trial court, we disagree. The trial court was not provided with any evidence that a general solicitation for additional offers was likely to result in offers greater than the LLJ offer. Nor did the receiver advocate for additional solicitations. The trial court also noted that a general solicitation of offers would result in additional delay and significant additional costs in receiver fees and associated attorney fees in advertising the sale and reviewing potential additional bids.[2] In addition, the landlord already had entered into an agreement to lease the business premises to LLJ and the trial court lacked the power to force the landlord to enter into a contract with a new third-party entity. Therefore, any potential additional bid for Barley's from a third-party could not include its existing prime business location, which was one of Barley's most valuable assets. Based upon these factors, the trial court concluded that the solicitation of new offers was not in the best interest of the parties. The appellants have not shown that the trial court abused its discretion in reaching this conclusion.

{¶ 53} Lastly, appellants argue that the trial court erred by making certain factual findings contained in the trial court's August 24, 2017 and June 4, 2018 orders without the benefit of evidence. (Appellants' Brief at 20-21.) Appellants identify five purported factual findings as the basis for their argument. Three of the alleged factual findings relate to the trial court's interpretation of the assignment provisions in the lease and why the trial court concluded that it would be unfair to permit the assignment of the lease without the landlord's consent. For the reasons previously noted, any issues related to the assignment provisions in the lease are moot in light of the default and impending lease termination.

---

[2] The trial court noted that the receiver, his administrative assistant, and his legal counsel, had collectively billed approximately $300,000 (excluding costs associated with the sale of jointly owned real estate not at issue in this appeal), as of June 4, 2018.

{¶ 54} Appellants also challenge the trial court's statement that the lease "is an equitable, enforceable document, and termination pursuant to its terms is just." (Aug. 24, 2017 Decision & Entry at 5.) This statement is not a factual finding. Rather, it reflects the trial court's conclusion that enforcing the termination provision was not unfair.

{¶ 55} Lastly, appellants point to statements in the trial court's June 4, 2018 decision that relate to the trial court's conclusion that a general solicitation for additional offers to purchase Barley's was not worth the effort and cost. Specifically, appellants cite the following excerpts from the trial court's decision:

> There is "no reason to believe a third-party would make an offer better than [Taste] or [LLJ]; the third party would end up in a similar position to [Taste], unable to enter a lease with [the landlord]," and "the new offer would [not] generate enough cash to offset the additional costs the receiver and his attorney would accrue on their work advertising the sale and reviewing the additional bids."

(Appellants' Brief at 20-21.) Again, these statements by the trial court simply explain the trial court's reasons for concluding that a general solicitation for additional offers to purchase Barley's would be costly and would not likely result in offers greater than the LLJ offer, particularly given that there could be no acquisition of the existing lease. The trial court had the benefit of extensive briefing by the parties, the landlord, and certain limited partners on these issues. Appellants' argument is unpersuasive. The trial court did not err in making these statements.

{¶ 56} For all these reasons, we overrule appellants' third assignment of error.

{¶ 57} Having overruled appellants' three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Application for reconsideration granted;*
*Jezerinac I vacated; judgment affirmed.*

NELSON, J., concurs.
BRUNNER, J., dissents.

NELSON, J., concurring.

{¶ 58} I concur fully in our decision granting reconsideration and affirming the judgment of the Franklin County Court of Common Pleas. I write separately simply to reaffirm the proposition that we best achieve stability in the law by following the law as it

is given to us.  Importantly, the necessity for faithful (and yes, by all means, prompt) application of the law extends to the law of contracts, which within defined constraints permits individuals and organizations to order their business affairs in somewhat predictable fashion according to the choices they make.

BRUNNER, J., dissenting.

{¶ 59}  I respectfully dissent from the decision of the majority and fully incorporate the majority decision as held in *Jezerinac v. Dioun*, 10th Dist. No. 18AP-479, 2019-Ohio-726, as the basis for this dissent.  Until today, this has been the law in this case and this district.  It was not reached without dissent, but it has been the law for nearly one year.

{¶ 60}  Today, this Court takes an "about-face" and leaves the parties in the unenviable position of having built, modified, and operated their business models in accord with what we pronounced to be the law one year ago.  It is axiomatic that we must not change the law based on disagreement or change of heart, and this is what we have done here.  If this Court is not satisfied with our existing law, it is incumbent on us to overrule it, not to change our minds via App.R. 26.

{¶ 61}  Our standard of review under App.R. 26 is based on the premise that an appellate court must determine whether the application "calls to the attention of the court an obvious error in its decision, or raises an issue for consideration that was either not considered at all or was not fully considered by the court when it should have been." *Columbus v. Hodge*, 37 Ohio App.3d 68 (10th Dist.1987), paragraph one of the syllabus. Importantly, an appellate court will not grant "[a]n application for reconsideration * * * just because a party disagrees with the logic or conclusions of the appellate court."  *Bae v. Dragoo & Assocs., Inc.*, 10th Dist. No. 03AP-254, 2004-Ohio-1297, ¶ 2, citing *Juhasz v. Costanzo*, 7th Dist. No. 99-CA-294, 2002-Ohio-553; *see also Hal v. State Dept. of Edn.*, 10th Dist. No. 18AP-301, 2020-Ohio-204, ¶ 1-2, quoting *State v. Harris*, 10th Dist. No. 13AP-1014, 2014-Ohio-672, ¶ 8.  Hence, an application for reconsideration is not intended for cases in which a party simply disagrees with the reasoning and conclusions of the appellate court.  *Drs. Kristal & Forche, D.D.S., Inc. v. Erkis*, 10th Dist. No. 09AP-06, 2009-Ohio-6478, ¶ 2, citing *State v. Owens*, 112 Ohio App.3d 334, 336 (11th Dist.1996).  An application for reconsideration should be denied where the moving party " 'simply seeks to "rehash the arguments" ' " presented in the initial appeal.  *Hal* at ¶ 2, quoting *Appenzeller*

*v. Ohio Dept. of Rehab & Corr.*, 10th Dist. No. 17AP-747, 2018-Ohio-1698, ¶ 4, quoting *Garfield Hts. City School Dist. v. State Bd. of Edn.*, 85 Ohio App.3d 117, 127 (10th Dist.1992).  Thus, if an application for reconsideration does not raise an issue that either was not considered at all or was not fully considered, nor demonstrates the court made an obvious error or rendered a decision unsupportable under the law, it should not be disturbed.  *Hal* at ¶ 2, citing *Harris* at ¶ 8.

**{¶ 62}** The majority's decision is no more than an about-face resulting not from obvious error or a decision that is "unsupportable under the law," but rather from converting a dissenting opinion to a majority opinion that would not have occurred without the appearance of a new judge on the panel.

**{¶ 63}** The Supreme Court of Ohio has a long history of changing its mind whenever the court composition changes and a history also of court members expressing their displeasure at the practice.  *See State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, ¶ 110, 118 (O'Neill, J., dissenting); *State v. Gonzales*, 150 Ohio St.3d 276, 2017-Ohio-777, ¶ 73 (O'Neill, J., dissenting); *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 78-89 (Sweeny and Resnick, JJ., dissenting); *Rocky River v. State Emp. Relations Bd.*, 41 Ohio St.3d 602, 604-05, fn. 3 (1989) (Brown, J., concurring).  In *Galatis,* Justices Sweeny and Resnick noted that if stare decisis is not accorded more respect by new judges and justices, "litigants may try to challenge precedent every time there is a change in the composition of the court. If this is allowed, issues will never be resolved as long as one side believes that a new court will save the day in another case." *Galatis* at ¶ 78.

**{¶ 64}** Former Justice Herbert Brown discussed this scenario of reconsidering recent, past decisions when new judges join the court.  He used this direct and poignant language to describe its use and the objections to it:

> Precedent (whether in substantive or procedural matters) is
> not a rationalization to be turned on and off to suit the whim of
> the beholder.

*Rocky River* at 605 (Brown, J., concurring).  Regardless of what may be the practice of the State's high court, it is disappointing that this Court now de facto overrules itself through an App.R. 26 motion for reconsideration, especially when the law is clear that reconsideration is not in order if a settled issue is not unsupportable under the law.  *Hal.*

_____