[Cite as *Ohio Veterans & Fraternal Charitable Coalition, Inc. v. Charitable Mgt. & Capital Group, L.L.C.*, 2025-Ohio-1191.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ohio Veterans and Fraternal Charitable Coalition, Inc., | : | |
| | : | |
| Plaintiff-Appellant, | : | No. 24AP-353 |
| | : | (C.P.C. No. 22CV-671) |
| v. | : | (REGULAR CALENDAR) |
| Charitable Management and Capital Group, LLC, | : | |
| | : | |
| Defendant-Appellee. | : | |

---

D E C I S I O N

Rendered on April 3, 2025

---

**On brief:** *Kravitz, Brown & Dortch, LLC, Michael D. Dortch,* and *Richard R. Parsons,* for appellant. **Argued:** *Michael D. Dortch.*

**On brief**: *Amundsen Davis LLC, Larry H. James,* and *Christopher R. Green,* for appellee. **Argued:** *Larry H. James.*

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Plaintiff-appellant, Ohio Veterans and Fraternal Charitable Coalition, Inc. ("OVFCC"), appeals from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Charitable Management and Capital Group, LLC ("CMCG"). For the reasons that follow, we affirm in part and reverse in part.

## I. Facts and Procedural History

{¶ 2} OVFCC is a nonprofit corporation representing several veterans' and fraternal organizations in the state of Ohio. OVFCC's member organizations include AMVETS Department of Ohio; American Legion Department of Ohio; Fraternal Order of

Eagles of Ohio; VFW of Ohio Charities, Inc.; Ohio State Moose Association; Ohio Council of Fraternal, Veterans and Service Organizations, Inc.; and Ohio Elks Association. Each OVFCC member organization has a 501(c)(3) charity to carry out the organization's charitable mission.

{¶ 3} The OVFCC member organizations historically raised funds to support their charitable causes through traditional raffles and bingo games. Over time, the OVFCC member organizations sought to modernize their charitable games. CMCG is a company engaged in the distribution and operation of electronic gaming terminals. In 2011, CMCG's owner, Alfred DeLeon, met with representatives from OVFCC to discuss "opportunities to raise money through a gaming device for their charities." (DeLeon Dep. at 17.) CMCG believed an electronic raffle game would comply with the applicable charitable gaming statutes in Ohio.

{¶ 4} After the parties' initial meeting, CMCG acquired electronic raffle software and installed the software on electronic raffle machines ("ERMs"). The ERMs consisted of a metal or wooden gaming cabinet, a touch screen computer monitor, a hard drive, a bill acceptor, and a printer. CMCG referred to the software installed on the ERMs as "Raffle 2.0." (DeLeon Dep. at 22.) The Raffle 2.0 software utilized a finite pool of 1,000,000 raffle tickets and each raffle ticket had an outcome or prize assigned to it before the game began. After a customer purchased a raffle ticket, the customer could choose the "quick reveal" option to immediately reveal the value of their raffle ticket, or the customer could choose to play a game, such as keno or poker, to reveal the prize associated with their ticket. The customer's choice to play a game did not affect the value of their raffle ticket. The Raffle 2.0 software disbursed tickets sequentially and all tickets had to be sold before the system would generate another pool of raffle tickets.

{¶ 5} From 2011 to 2019, OVFCC and CMCG entered into a total of four exclusive agreements with each other. On May 12, 2011, OVFCC and CMCG entered into their first exclusive agreement for a 90-day "Pilot Program." (Mar. 28, 2023 Mot. for Summ. Jgmt., Ex. 1, § I (A).) On July 28, 2011, the parties entered into their second exclusive agreement. In the second exclusive agreement, OVFCC granted CMCG "the exclusive right for a term of five (5) years to install, maintain, and operate [ERMs] upon the premises of its participating members." (Mot. for Summ. Jgmt., Ex. 2, § I.) The parties agreed to split the net revenue from the ERMs as follows: months 1-6, 60 percent to CMCG and 40 percent to

the member locations; months 7-9, 50 percent to CMCG and 50 percent to the member locations; and months 10-60, 40 percent to CMCG and 60 percent to the member locations. CMCG and OVFCC also entered into individual contracts with each OVFCC member location based on the terms contained in the parties' exclusive agreement.

{¶ 6} In late 2013, the Ohio Attorney General ("AG") instructed the OVFCC member locations to stop using the ERMs. The AG believed the raffle conducted on the ERMs was unlawful under the charitable gaming statutes in R.C. Ch. 2915. On December 19, 2013, OVFCC filed a complaint in Franklin C.P. case No. 13CV-13610, seeking declaratory and injunctive relief against the AG and the Ohio Liquor Control Commission ("LCC"). Contemporaneously with the complaint, OVFCC moved for a temporary restraining order ("TRO") and the trial court granted the TRO that same day. The TRO "immediately RESTRAINED" the AG and the LCC "from taking any enforcement action with respect to the Electronic Raffle Machines referenced in Plaintiffs' Verified Complaint and utilized by veteran's organizations and fraternal organizations for charitable purposes in compliance with R.C. § 2915.092." (Mot. for Summ. Jgmt., Ex. 3 at 1.) On December 23, 2013, the trial court amended the TRO to clarify the TRO would remain in effect pending further orders from the trial court.

{¶ 7} On August 13, 2014, while case No. 13CV-13610 remained pending, the parties executed their third exclusive agreement. OVFCC again granted CMCG the exclusive right to install, maintain, and operate ERMs on the premises of OVFCC's member locations for a term of five years. The parties agreed to split the net revenue from the ERMs as follows: 60 percent to the member locations and 40 percent to CMCG.

{¶ 8} On February 23, 2018, the trial court issued its final decision in case No. 13CV-13610. The trial court analyzed former versions of R.C. 2915.092(A) and 2915.01(CC), which provided, in relevant part, as follows:

> R.C. 2915.092(A):
>
> (1) . . . [A] charitable organization, . . . a veteran's organization, [or a] fraternal organization . . . may conduct a raffle to raise money for the organization . . . and does not need a license to conduct bingo in order to conduct a raffle drawing that is not for profit.
> . . .
> R.C. 2915.01(CC):

"Raffle" means a form of bingo in which the one or more prizes are won by one or more persons who have purchased a raffle ticket. The one or more winners of the raffle are determined by drawing a ticket stub or other detachable section from a receptacle containing ticket stubs or detachable sections corresponding to all tickets sold for the raffle.

(Feb. 23, 2018 Decision on Cross Mots. for Summ. Jgmt. & Final Jgmt. Entry at 10-11.)

{¶ 9} Based on the plain language of the statutes, the trial court concluded the ERMs did not conduct a "raffle" as defined in R.C. 2915.01(CC). The court noted the ERMs relied on "predetermine[d] winning and losing ticket numbers thereby removing the randomness of the traditional raffle game win" and did not rely on a "specific drawing of winners." (Mot. for Summ. Jgmt., Ex. 6 at 15-16.) Because the ERMs did not conduct a raffle as defined by R.C. 2915.01(CC), the court found the members' use of the ERMs unlawful under R.C. 2915.092(A).

{¶ 10} On March 9, 2018, the trial court in case No. 13CV-13610 granted OVFCC's motion to stay the February 23, 2018 judgment. The court indicated the stay of judgment would "remain in effect until all appeals of the February 23, 2018 Decision have been exhausted." (Mot. for Summ. Jgmt., Ex. 7 at 1.)

{¶ 11} OVFCC appealed the trial court's decision to this court. On November 20, 2018, in *Ohio Veterans & Fraternal Charitable Coalition v. DeWine*, 2018-Ohio-4679 (10th Dist.), we issued a decision affirming the trial court. We concluded the ERMs did not satisfy the definition of a "raffle" contained in R.C. 2915.01(CC), because the ERMs "utilize[d] a software that predetermine[d] which tickets will correspond to a winning prize before any tickets are sold." *Ohio Veterans & Fraternal Charitable Coalition* at ¶ 28. As such, we found the members' use of the ERMs unlawful under R.C. 2915.092(A). *Id.* at ¶ 29.

{¶ 12} OVFCC appealed our decision in *Ohio Veterans & Fraternal Charitable Coalition* to the Supreme Court of Ohio. After filing the appeal, OVFCC filed several motions asking the Supreme Court to hold in abeyance its ruling on jurisdiction. The Supreme Court granted OVFCC's motions and held its ruling on jurisdiction in abeyance from 2019 through 2021. While the appeal to the Supreme Court remained pending, OVFCC was promoting legislation in the Ohio General Assembly to provide a legislative solution to the case.

{¶ 13} Following our decision in *Ohio Veterans & Fraternal Charitable Coalition*, CMCG began to develop new raffle software known as "Raffle 3.0." (Price Dep. at 64.) CMCG intended for Raffle 3.0 "to be a contingency that would allow a new lawsuit to be filed" if the Supreme Court affirmed this court's decision in *Ohio Veterans & Fraternal Charitable Coalition*. (Price Dep. at 64.) CMCG built the Raffle 3.0 software "based on" this court's holding in *Ohio Veterans & Fraternal Charitable Coalition*. (DeLeon Dep. at 29.) Raffle 3.0 used a finite set of 25,000 raffle tickets and randomly selected a winning ticket after the entire pool of raffle tickets had been sold.

{¶ 14} On May 8, 2019, OVFCC and CMCG executed their fourth exclusive agreement. OVFCC again granted CMCG the exclusive right to "install, maintain, and operate charitable electronic gaming devices upon the premises of its participating members" for a term of five years. (Compl., Ex. A at § I.) The parties agreed to split the "net revenue from locations operating versions of Raffle 3.0 or other upgraded charitable electronic games" as follows: 50 percent to the member locations and 50 percent to CMCG. (Compl., Ex. A at § I (A)(3).) The fourth exclusive agreement also obligated CMCG to pay OVFCC "on a weekly basis a fee of two percent (2%) of CMCG's Gross Revenue from all income generated by each device operating versions of Raffle 3.0 or other legal upgraded charitable electronic games including electronic pull tab devices, electronic skill devices, and Class II and III devices." (Compl., Ex. A at § I (A)(4).) The agreement defined "CMCG's Gross Revenue" as "all revenue collected from these terminal devices less prize payouts." (Compl., Ex. A at § I (A)(4).)

{¶ 15} During the fourth exclusive agreement, CMCG deployed a "massive upgrade of all game terminals" at the OVFCC member locations. (Apr. 18, 2023 Memo Contra, Ex. 27 at 2.) CMCG also entered into a distribution agreement with another company, Grover Gaming, for Grover Gaming to install its gaming terminals at the OVFCC member locations. Grover Gaming specifically designed the software on its gaming terminals to function the same as Raffle 2.0. By the end of the fourth exclusive agreement, all the ERMs operating at the OVFCC member locations were Grover Gaming machines. However, aside from the ERMs operating the Raffle 3.0 software, the ERMs all continued to operate the Raffle 2.0 software.

{¶ 16} CMCG did not pay OVFCC the two percent fee described in § I (A)(4) of the parties' fourth exclusive agreement. OVFCC's director, Mitch Given, spoke to Mr. DeLeon

about CMCG's failure to pay the fee. Mr. DeLeon responded stating, "[W]ell, that only applied to Raffle 3.0, not to any other devices." (Given Dep. at 45.) Mr. DeLeon claimed OVFCC was "never at any time . . . due 2 percent on Raffle 2.0" devices. (DeLeon Dep. at 51-52.)

{¶ 17} On July 1, 2021, Ohio Governor Mike DeWine signed H.B. 110, which legalized electronic instant bingo for veterans' and fraternal organizations in Ohio. To be eligible to conduct electronic instant bingo under the new law, an organization could not have utilized an ERM, as described in *Ohio Veterans & Fraternal Charitable Coalition*, "at any time on or after January 1, 2022." R.C. 2915.14(A)(3). Thus, after the effective date of H.B. 110, the OVFCC member organizations no longer needed to conduct electronic raffle games to raise money for their charitable causes. On December 30, 2021, OVFCC dismissed its appeal pending in the Supreme Court.

{¶ 18} On January 31, 2022, OVFCC filed a complaint against CMCG alleging claims for breach of contract, unjust enrichment, accounting, and declaratory judgment. OVFCC's breach of contract claim alleged CMCG "failed to pay two percent (2%) of the gross revenue collected as required under Section I (A)(4)" of the parties' fourth exclusive agreement. (Compl. at ¶ 22.) OVFCC alleged it was entitled to an accounting because it did not "possess the information necessary to determine the full extent of the amount CMCG owes it." (Compl. at ¶ 30.) OVFCC's claim for declaratory judgment asked the trial court to declare "that as a result of CMCG's actions and inactions, the Participating Members have the right, at their option, to terminate the Location Contract to which it is a party." (Compl. at ¶ 36.)

{¶ 19} On March 28, 2023, CMCG filed a Civ.R. 56 motion for summary judgment. CMCG stated that, during the term of the parties' fourth exclusive agreement, it "installed a total of 24 ERMs operating the Raffle 3.0 software . . . in six (6) participating member locations." (Mot. for Summ. Jgmt. at 10.) CMCG admitted it failed to pay OVFCC the two percent fee described in § I (A)(4) for the machines operating Raffle 3.0. CMCG claimed there "were no 'other legal upgraded charitable electronic games' " subject to the two percent fee "because both the trial court and court of appeals in the raffle litigation had declared the electronic raffle game played on the ERMs an illegal version of gambling." Mot. for Summ. Jgmt. at 18.) CMCG produced location summary reports ("LSRs") for each of the six locations that had Raffle 3.0 machines. The LSRs contained financial information for the ERMs at each location. Relying on the LSRs, CMCG claimed the Raffle 3.0 machines

generated $29,059.71 in gross revenue, and it owed OVFCC 2 percent of that amount, i.e. $581.17.

{¶ 20} On April 18, 2023, OVFCC filed a memorandum contra in response to CMCG's motion for summary judgment. OVFCC claimed that any ERM operating the Raffle 2.0 software during the term of the fourth exclusive agreement was "legal" because the "software was 'permitted' 'not forbidden by' 'warranted or authorized by'. . . the TRO and then by [the trial court's] decision to maintain the TRO via a court-ordered stay of their judgments." (Apr. 18, 2023 Memo Contra at 14.) OVFCC also claimed CMCG upgraded all of the ERMs operating at the OVFCC member locations during the term of the fourth exclusive agreement. OVFCC stated the gross revenue generated by the ERMs during the fourth exclusive agreement was $105,113,656.84 and that its damages were 2 percent of that figure, i.e. roughly $2.1 million. (Apr. 18, 2023 Memo Contra at 3-4.)

{¶ 21} CMCG filed a reply to OVFCC's memorandum contra on April 25, 2023. CMCG asserted OVFCC mistakenly relied on the figures stated in the "Net In" column on the LSRs to claim the ERMs generated $105,113,656.84 in gross revenue. CMCG claimed the "Due to CMCG" column on the LSRs documented its gross revenue. (Apr. 25, 2023 Def. Charitable Mgt. & Capital Group, LLC's Reply to Pl.'s Memo Contra at 5.) CMCG's director of operations, Chad Criger, explained the "Net In" column on the LSRs represented the net revenue generated by the ERMs. (Criger Dep. at 30-31.) Mr. Criger further explained the "Due to CMCG" column on the LSRs represented the amount of net revenue CMCG retained pursuant to the "percentage agreed upon" by the parties. (Criger Dep. at 34.)

{¶ 22} On May 1, 2023, OVFCC filed a motion for leave to file a sur-reply. On May 25, 2023, the trial court granted OVFCC's motion for leave. In its sur-reply, OVFCC stated CMCG's gross revenue was reported in the "Net In" column on the LSRs. OVFCC also noted that, even using the "Due to CMCG" column from the LSRs, "OVFCC calculate[d] that CMCG actually received $117,145.11 in revenue from Raffle 3.0 Machines." (May 1, 2023 Sur-reply at 3-4.) As such, OVFCC asserted CMCG could not "justify its own claim[]" that it received only $29,059.71 in gross revenue from the Raffle 3.0 machines. (May 1, 2023 Sur-reply at 4.)

{¶ 23} On May 14, 2024, the trial court issued a decision granting CMCG's motion for summary judgment. The court found the language of the fourth exclusive agreement unambiguous in its meaning and effect. The court observed that, aside from the machines

operating the Raffle 3.0 software, all other ERMs "contained the Raffle 2.0 software." (May 14, 2024 Decision & Entry Granting Def.'s Mot. for Summ. Jgmt. at 11.) As such, the court found that any upgrade to the machines operating the Raffle 2.0 software "had no impact on the legality or illegality of the ERMs." (Decision & Entry Granting Def.'s Mot. for Summ. Jgmt. at 11.) The court granted CMCG summary judgment on OVFCC's claims for breach of contract, unjust enrichment, and an accounting. Regarding OVFCC's claim for declaratory judgment, the court declared OVFCC was entitled to $581.17 resulting from the 6 member locations with ERMs operating the Raffle 3.0 software.

## II. Assignments of Error

{¶ 24} OVFCC appeals, assigning the following errors for our review:

Assignment of Error No. 1:

The trial court erred when it eschewed the principles of contract interpretation and failed to apply common, ordinary meanings to words.

Assignment of Error No. 2:

The trial court erred in rendering summary judgment in favor of Appellee because the undisputed material facts allow reasonable minds to reach a final conclusion favoring Appellant.

Assignment of Error No. 3:

The trial court erred when it ignored evidence that Appellee's game terminals were upgraded and replaced with new, different, and more popular video games, more attractive cabinetry, larger video screens, and different operating software during the term of the 2019 Contract.

Assignment of Error No. 4:

The trial court failed to address a third dispute regarding contract language first raised by CMCG in its Reply Brief supporting its motion.

Assignment of Error No. 5:

The trial court erred by failing to Order CMCG to account to OVFCC and pay CMCG all sums due, together with statutory interest.

## III. Legal Analysis

### A. OVFCC's First and Second Assignments of Error

{¶ 25} In its first and second assignments of error, OVFCC generally asserts the trial court erred by granting CMCG summary judgment on OVFCC's claim for breach of

contract. As such, we address these assignments of error jointly. OVFCC contends the trial court eschewed principles of contract interpretation and failed to apply the common and ordinary meaning of the term "legal" when construing the parties' fourth exclusive agreement.

{¶ 26} An appellate court reviews a grant of summary judgment under a de novo standard. *Capella III, L.L.C. v. Wilcox*, 2010-Ohio-4746, ¶ 16 (10th Dist.), citing *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 548 (2001). "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." (Internal quotation marks deleted and citations omitted.) *Holt v. State*, 2010-Ohio-6529, ¶ 9 (10th Dist.). Summary judgment is appropriate only when the moving party demonstrates (1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 27} Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). If the moving party fails to satisfy its initial burden, the court must deny the motion for summary judgment. *Id.* If the moving party satisfies its initial burden, summary judgment is appropriate unless the nonmoving party responds, by affidavit or otherwise as provided under Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Id.*; *Hall v. Ohio State Univ. College of Humanities*, 2012-Ohio-5036, ¶ 12 (10th Dist.), citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist. 1991). Because summary judgment is a procedural device used to terminate litigation, it must be awarded with caution and all doubts must be resolved in favor of the nonmoving party. *Davis v. Loopco Industries, Inc.*, 66 Ohio St.3d 64, 66 (1993), citing *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-59 (1992).

{¶ 28} To demonstrate a claim for breach of contract, a plaintiff must establish "(1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *Claris, Ltd. v. Hotel Dev. Servs., L.L.C.*, 2018-Ohio-2602, ¶ 28 (10th Dist.), citing *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-

15, ¶ 41. To prove a breach by the defendant, a plaintiff must show that the defendant " 'did not perform one or more of the terms of a contract.' " *Jarupan v. Hanna*, 2007-Ohio-5081, ¶ 18 (10th Dist.), quoting *Little Eagle Properties v. Ryan*, 2004-Ohio-3830, ¶ 15 (10th Dist.). The plaintiff must present sufficient evidence to show entitlement to damages in an amount ascertainable with reasonable certainty. *Natl. Constr. Group, Ltd. v. P&S Hotel Group, Ltd.*, 2021-Ohio-2940, ¶ 24 (10th Dist.).

{¶ 29} The construction of a written contract is a question of law. *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus; *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 2007-Ohio-5026, ¶ 38. "[A] de novo standard of review applies to matters of law, including the interpretation and construction of written contracts." *Gatling Ohio, L.L.C. v. Allegheny Energy Supply Co., L.L.C.*, 2018-Ohio-3636, ¶ 12 (10th Dist.), citing *Long Beach Assn. v. Jones*, 82 Ohio St.3d 574 (1998). "Under the de novo standard, the court of appeals gives no deference to a trial court's interpretation of legal issues." *Id.*

{¶ 30} When construing the terms of a written contract, a trial court's principal objective is to determine the intent of the parties. *Jezerinac v. Dioun*, 2020-Ohio-587, ¶ 33 (10th Dist.), citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999). The parties' intent "is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987). " 'When parties to a contract dispute the meaning of the contract language, courts must first look to the four corners of the document to determine whether or not an ambiguity exists.' " *Min You v. Northeast Ohio Med. Univ.*, 2020-Ohio-4661, ¶ 15 (10th Dist.), quoting *Drs. Kristal & Forche, D.D.S., Inc. v. Erkis*, 2009-Ohio-5671, ¶ 21 (10th Dist.). "Where the terms of the contract are clear and unambiguous, a court should not look beyond the plain language of the instrument to determine the rights and obligations of the parties." *Guaranteed Constr. Servs., L.L.C. v. Grand Communities, Ltd.*, 2017-Ohio-9288, ¶ 23 (10th Dist.), citing *Drs. Kristal & Forche, D.D.S., Inc.* at ¶ 21.

{¶ 31} "Common words in a contract are given their plain and ordinary meaning, unless another meaning is clearly evident from the face or overall content of the contract, or unless the result is manifestly absurd." *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 2015-Ohio-3716, ¶ 36, citing *Alexander*. The trial court must read words and phrases in context and apply the rules of grammar and common usage. *Buffalo Wings &*

*Rings, L.L.C. v. M3 Rest. Group, L.L.C.*, 2015-Ohio-3843, ¶ 18 (10th Dist.), citing *Keller v. Foster Wheel Energy Corp.*, 2005-Ohio-4821 (10th Dist.).

**{¶ 32}** Contract terms are ambiguous if the meaning of the terms cannot be discerned from reading the entire contract, or if the terms are reasonably susceptible to more than one interpretation. *Moody v. Ohio Rehab. Servs. Comm.*, 2002-Ohio-6965, ¶ 7 (10th Dist.), citing *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55 (2d Dist. 1998). While the issue of whether a contract is ambiguous is a question of law, the meaning of words or phrases in an ambiguous contract is a question of fact. *Atelier Dist. v. Parking Co. of Am., Inc.*, 2007-Ohio-7138, ¶ 17 (10th Dist.), citing *Ohio Historical Soc. v. Gen. Maintenance & Eng. Co.*, 65 Ohio App.3d 139, 146 (10th Dist. 1989). Where the language of a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent. *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 12, citing *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635 (1992).

**{¶ 33}** OVFCC asserts the trial court erred in its interpretation of the phrase "other legal upgraded charitable electronic games" in § I (A)(4) of the parties' fourth exclusive agreement. (Appellant's Brief at 23.) OVFCC contends the trial court erred by concluding the term "legal" meant "conformance with Ohio statutory laws." (Appellant's Brief at 23.) While OVFCC acknowledges that conformance with statutory laws is "one *possible* meaning of the word 'legal,' " it asserts that the ERMs operating pursuant to the TRO and the court-ordered stay of judgment were "legal" because they were " 'not forbidden by' and remained 'warranted or authorized by' 'permitted by' and 'sanctioned by' those same courts." (Emphasis in original.) (Appellant's Brief at 26, 30.)

**{¶ 34}** "In giving words their common, everyday meaning, it is common for a court to rely on dictionary definitions." *Thomas v. Logue*, 2022-Ohio-1603, ¶ 15 (10th Dist.); *accord DN Reynoldsburg, L.L.C. v. Maurices Inc.*, 2022-Ohio-949, ¶ 25, fn. 8 (10th Dist.) (noting it is "a well-established practice for courts to utilize dictionary definitions to discern the ordinary, everyday meaning of terms employed in contracts"). Black's Law Dictionary defines "legal" as meaning "[o]f, relating to, or involving law generally; falling within the province of law" and as "[e]stablished, required, or permitted by law." *Black's Law Dictionary* (12th Ed. 2024). Merriam-Webster's Collegiate Dictionary defines "legal" as "of or relating to law," "deriving authority from or founded on law," "established by law," and

"conforming to or permitted by law or established rules." *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2003).

{¶ 35} Accordingly, the term "legal" encompasses that which is established by or permitted by "law." Black's Law Dictionary defines the term "law" as meaning the "regime that orders human activities and relations through systematic application of the force of politically organized society; the legal system," and as the "body of rules, standards, and principles that the courts of a particular jurisdiction apply in deciding controversies brought before them." *Black's Law Dictionary* (12th Ed. 2024). Merriam-Webster's Collegiate Dictionary defines "law" as "a binding custom or practice of a community : a rule of conduct or action prescribed or formally recognized as binding or enforced by a controlling authority" and as "the whole body of such customs, practices, or rules." *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2003).

{¶ 36} Thus, the plain and ordinary meaning of the term "legal" is that which is permitted or established by the body of rules and principles which govern society. Accordingly, for a charitable electronic game to be "legal" in Ohio, the game had to be permitted by or established by the Ohio Revised Code. OVFCC fails to demonstrate that another meaning of the term "legal" was evident from the overall content of the fourth exclusive agreement, or that the plain meaning of the term results in manifest absurdity. *See NetJets, Inc. v. Binning*, 2005-Ohio-3934, ¶ 16 (10th Dist.) (stating that "[u]ndefined terms in a contract are to be interpreted according to their plain, ordinary meaning unless doing so would create an absurd result"); *Leslie v. Baltes*, 1990 Ohio App. LEXIS 2285, *6-7 (10th Dist. June 7, 1990), citing *Alexander* (noting that, if a term used in a contract "is a broad term subject to various definitions . . . , unless otherwise defined by the contract, it should be given its plain and ordinary meaning").

{¶ 37} In the fourth exclusive agreement, OVFCC granted CMCG the exclusive right to install and maintain the ERMs "as long as such devices compl[ied] with the laws of the state of Ohio or an order from a court of competent jurisdiction." (Fourth Exclusive Agreement at § I.) While the two percent fee in § I (A)(4) applied only to machines operating Raffle 3.0 "or other legal upgraded charitable electronic games," the net revenue split from the ERMs in § I (A)(3) applied to machines operating Raffle 3.0 "or other upgraded charitable electronic games." Thus, the parties agreed CMCG and the member locations would split the net revenue from any machine operating an upgraded game,

regardless of whether the game was legal, but limited the two percent fee to only games which were both legal and upgraded. When the parties executed the fourth exclusive agreement on May 8, 2019, both this court and the trial court in case No. 13CV-13610 had informed the parties the Raffle 2.0 software did not comply with the charitable gaming laws in R.C. Ch. 2915.

{¶ 38} OVFCC, however, claims the parties viewed "compliance with the TRO . . . as a 'legal' option for purposes of the [fourth exclusive agreement]." (Appellant's Brief at 29.) OVFCC's contention in this regard attempts to impute a meaning to the term "legal" which differs from the plain and ordinary meaning of the term. Because the term "legal" is unambiguous, we may not consider evidence beyond the four corners of the contract to alter its meaning. *See Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 2019-Ohio-4716, ¶ 13 (stating if the "language of a contract is plain and unambiguous, we enforce the terms as written, and we may not turn to evidence outside the four corners of the contract to alter its meaning"); *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989) (stating that "[i]ntentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence"). *See also Dugan & Meyers Constr. Co. v. Ohio Dept. of Adm. Servs.*, 2007-Ohio-1687, ¶ 29, quoting *Ohio Crane Co. v. Hicks*, 110 Ohio St. 168, 172 (1924) (noting that " 'it is not the province of courts to relieve parties of improvident contracts' ").

{¶ 39} Moreover, neither the TRO nor the stay of judgment in case No. 13CV-13610 rendered the ERMs subject to those orders "legal." The TRO simply restrained the AG and the LCC from taking an enforcement action against the OVFCC member locations for utilizing the ERMs while the TRO was in effect. *See Grogan v. T.W. Grogan Co., Inc.*, 143 Ohio App.3d 548, 556 (8th Dist. 2001) (noting the purpose of a TRO is to "preserve the status quo pending resolution of the underlying matter"); *Gobel v. Laing*, 12 Ohio App.2d 93 (10th Dist. 1967). As an interlocutory order, the TRO expired when the trial court issued its final decision in case No. 13CV-13610. *See Walters v. Walters*, 2013-Ohio-2554, ¶ 54 (7th Dist.); *Ankrom v. Hageman*, 2007-Ohio-5092, ¶ 12 (10th Dist.); *Van Camp v. Riley*, 16 Ohio App.3d 457, 459 (12th Dist. 1984).

{¶ 40} Civ.R. 62 provides that when an appeal is taken, "the appellant may obtain a stay of execution of a judgment or any proceedings to enforce a judgment by giving an adequate supersedeas bond." Civ.R. 62(B). "An order to stay the *execution* of a judgment

has no effect on a judgment's finality or enforceability, but simply prevents the actual enforcement or execution." (Emphasis in original.) *In re S.S.*, 2018-Ohio-2279, ¶ 17 (9th Dist.) (noting the purpose of a stay of execution of a judgment is "to avoid the merits of the appeal becoming moot because the judgment has been executed or satisfied"). *See also Rymers v. Rymers*, 2010-Ohio-2684, ¶ 19 (11th Dist.) (noting that a stay of execution of judgment "simply places the effect of [the] judgment on hold"). Thus, while the stay in case No. 13CV-13610 prevented enforcement of the trial court's February 23, 2018 judgment, it did not invalidate the judgment or otherwise render the game played on the ERMs a "legal" raffle.

{¶ 41} Mr. Criger explained that "everything but these Raffle 3.0" machines contained the "Raffle 2.0" software. (Criger Dep. at 56.) Mr. Criger noted that, while CMCG had five different generations of ERMs, "[a]ll standards of the first four generation types were all held consistently to play as a Raffle 2.0." (Criger Dep. at 48.) CMCG's fifth generation ERM was "Raffle 3.0 only." (DeLeon Dep. at 24.) The Raffle 2.0 software was premised on a finite pool of raffle tickets with predetermined winning and losing tickets. As this court in *Ohio Veterans & Fraternal Charitable Coalition* explained, the use of predetermined winning and losing raffle tickets did not comply with the statutory definition of a raffle in R.C. 2915.01(CC). Accordingly, the ERMs operating the Raffle 2.0 software were not operating "legal" charitable electronic games. Therefore, the two percent fee described in § I (A)(4) of the fourth exclusive agreement could not apply to the ERMs operating Raffle 2.0.

{¶ 42} As noted, however, § I (A)(4) also required CMCG to pay OVFCC two percent of CMCG's gross revenue from each device operating Raffle 3.0. In its motion for summary judgment, CMCG conceded "it [was] in breach of Exclusive Agreement #4" because it had "not paid OVFCC for the six (6) participating member locations that operated Raffle 3.0." (Emphasis in original.) (Mot. for Summ. Jgmt. at 16.) CMCG informed the trial court that only "the fourth element to OVFCC's claim for breach of contract [regarding damages was] in dispute." (Mot. for Summ. Jgmt. at 16.)

{¶ 43} Despite CMCG's admission to breaching the contract, the trial court granted CMCG summary judgment on OVFCC's claim for breach of contract. The court issued a declaratory judgment stating that, because there were six member locations operating Raffle 3.0 machines, "consistent with Section 1(A)(4) of EA 4, CMCG owes OVFCC a total

of $581.17." (Decision & Entry Granting Def.'s Mot. for Summ. Jgmt. at 13.) OVFCC's claim for declaratory judgment, however, asked the court to declare that the OVFCC member locations had the "right, at their option, to terminate the Location Contract to which it [was] a party based upon CMCG's breach" of the fourth exclusive agreement. (Compl. at ¶ 36.)

{¶ 44} In its motion for summary judgment, CMCG relied on the LSRs in its Exhibits 14 to 19 to claim it earned the following amounts, and owed OVFCC the following amounts, from the Raffle 3.0 machines operating at the six OVFCC member locations:

> VFW 7174 (The Plains, OH), CMCG Net $3,683.59, Amount Due to OVFCC $73.67
>
> VFW 3320 (Marysville, OH), CMCG Net $14,024.68, Amount Due to OVFCC $280.49
>
> VFW 3331 (Circleville, OH), CMCG Net $5,413.47, Amount Due to OVFCC $108.27
>
> VFW 1598 (Columbus, OH), CMCG Net $533.60, Amount Due to OVFCC $10.67
>
> AMVETS 0089 (Columbus, OH), CMCG Net $2,543.56, Amount Due to OVFCC $50.87
>
> VFW 5713 (Celina, OH), CMCG Net $2,859.81, Amount due to OVFCC $57.20

(Mot. for Summ. Jgmt. at 13, 19.) Accordingly, CMCG claimed its total net revenue from the Raffle 3.0 machines was $29,059.71, and the amount due to OVFCC was $581.17.

{¶ 45} OVFCC's second assignment of error broadly asserts the trial court erred by granting CMCG's motion for summary judgment. As noted above, we review a grant of summary judgment under a de novo standard and must independently review the record. *Capella III, L.L.C.*, 2010-Ohio-4746, at ¶ 16; *Holt*, 2010-Ohio-6529, at ¶ 9. *See also Harrod v. Travelers Property Cas.*, 2003-Ohio-7229, ¶ 14 (10th Dist.). Pursuant to our de novo review, we find genuine issues of material fact regarding OVFCC's damages resulting from CMCG's failure to pay OVFCC two percent of its gross revenue from the machines operating Raffle 3.0.

{¶ 46} In its motion for summary judgment, CMCG relied on Exhibit 19 to assert its net revenue from the Raffle 3.0 machines at VFW 7174 in The Plains, Ohio totaled $3,683.59, and the 2 percent fee due to OVFCC from this location was $73.67. (Mot. for Summ. Jgmt. at 13, 19.) CMCG's Exhibit 19 depicted information for "Z - VFW 7174 - R3.0." (Mot. for Summ. Jgmt., Ex. 19.) Mr. Criger affirmed the designation "R3.0" next to a

location's name referred to "the Raffle 3.0 machines" at that location. (Criger Dep. at 55.) The LSRs in Exhibit 19 identified the following amounts under the "Due to CMCG" column for Z - VFW 7174 - R3.0: July 2019, $1,676.50; August 2019, $759.50; September 2019, $468.64; October 2019, $483.50; November 2019, $689.93; December 2019, $718.02; January to December 2020, $4,765.35. (Mar. 28, 2023 Mot. for Summ. Jgmt., Ex. 19.) These figures yield a total of $9,561.44 and 2 percent of $9,559.44 is $191.23. Thus, the amounts reported on CMCG's Exhibit 19 do not support CMCG's claim that it owed OVFCC only $73.67 from the Raffle 3.0 machines operating at VFW 7174.

{¶ 47} Our review of CMCG's Exhibits 14 to 18 yield a similar result for each of the remaining 5 locations with Raffle 3.0 machines.[1] The exhibits demonstrate the total amount reported in the "Due to CMCG" column from the six locations operating Raffle 3.0 machines was $118,794.65.[2] Two percent of $118,794.65 would be $2,375.89. We find nothing in the record to support CMCG's contention that its gross revenue from the Raffle 3.0 machines at the 6 locations was $29,059.71 or that it owed OVFCC only $581.17.

---

[1] Exhibit 16 addressed VFW 3320 in Marysville, Ohio. The LSRs identified the following amounts under the "Due to CMCG" column for "VFW 3320 – R3.0": August 2019, $3,551.04; September 2019, $2,948.05; October 2019, $1,698.09; November 2019, $2,960.98; December 2019, $2,866.50; January to December 2020, $25,638.33. (Mot. for Summ. Jgmt., Ex. 16.) These amounts yield a total of $39,662.99. Two percent of $39,662.99 is $793.26.

Exhibits 16 and 17 addressed VFW 3331 in Circleville, Ohio. The LSRs identified the following amounts under the "Due to CMCG" column for "VFW 3331 – R3.0": August 2019, $720.20; September 2019, $1,508.50; October 2019, $954.50; November 2019, $1,217.23; December 2019, $1,013.04; January to December 2020, $27,586.07. (Mot. for Summ. Jgmt., Ex. 16, 17.) These amounts yield a total of $32,999.54. Two percent of $32,999.54 is $659.99.

Exhibit 15 addressed VFW 1598 in Columbus, Ohio. The LSRs identified the following amounts under the "Due to CMCG" column for "VFW 1598 – R3.0": October 2019, $169.50; November 2019, $128.60; December 2019, $235.50; January to December 2020, $2,676.93. (Mot. for Summ. Jgmt., Ex. 15.) These amounts yield a total of $3,210.53. Two percent of $3,210.53 is $64.21.

Exhibit 14 addressed AMVETS 0089 in Columbus, Ohio. However, the LSRs for AMVETS 0089 do not contain the "R3.0" designation. Rather, the LSRs in Exhibit 14 identified the location as "AMVETS 0089 (G)." (Mot. for Summ. Jgmt., Ex. 14.) Because CMCG submitted Exhibit 14 as evidence regarding the Raffle 3.0 machines at AMVETS 0089, we presume "AMVETS 0089 (G)" refers to the Raffle 3.0 machines operating at this location. The LSRs identified the following amounts under the "Due to CMCG" column for AMVETS 0089 (G): November 2019, $1,133.52; December 2019, $1,410.04; and January to December 2020, $15,559.73. (Mot. for Summ. Jgmt., Ex. 14.) These amounts yield a total of $18,103.29. Two percent of $18,103.29 is $362.06.

Exhibit 18 addressed VFW 5713 in Celina, Ohio. The LSRs identified the following amounts under the "Due to CMCG" column for "VFW 5713 – R3.0": November 2019, $1,144.03; December 2019, $1,715.78; January to December 2020, $12,397.05. (Mot. for Summ. Jgmt., Ex. 18.) These amounts yield a total of $15,256.86. Two percent of $15,256.86 is $305.14.

[2] We do not determine in the present appeal whether the "Net In" or "Due to CMCG" column on the LSRs depicted CMCG's gross revenue. Because the amount reported in the "Due to CMCG" column is necessarily less than the amount reported in the "Net In" column, CMCG's gross revenue from the Raffle 3.0 machines would be even greater under an analysis utilizing the "Net In" figures.

{¶ 48} Accordingly, our de novo review of the record demonstrates genuine issues of material fact regarding the damages resulting from CMCG's admitted breach of the parties' fourth exclusive agreement. "Damages need not be calculated with mathematical certainty, but cannot be based on mere speculation and conjecture." *Atelier Dist.*, 2007-Ohio-7138, at ¶ 60, citing *Allied Erecting & Dismantling Co., Inc. v. Youngstown*, 2002-Ohio-5179, ¶ 64 (7th Dist.). Because we find no support for the trial court's conclusion that CMCG owed OVFCC only $581.17, and because CMCG admitted it breached the contract, we are compelled to reverse the trial court's decision granting CMCG summary judgment on OVFCC's claim for breach of contract. *See MacDonald v. Authentic Invests., L.L.C.*, 2016-Ohio-4640, ¶ 47 (10th Dist.) (holding that, because this court could not "tell from the trial court decision how it arrived at its calculation" of damages, "we remand[ed] this matter to the trial court to recalculate the amount of damages"); *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 360 (1992).

{¶ 49} Based on the foregoing, we overrule OVFCC's first assignment of error. We overrule OVFCC's second assignment of error in part because the trial court did not err in its construction of the term "legal" in the parties' fourth exclusive agreement. We sustain OVFCC's second assignment of error in part because we find genuine issues of material fact regarding the damages resulting from CMCG's breach of the fourth exclusive agreement. We remand the case to the trial court for it to determine the damages resulting from CMCG's failure to pay OVFCC two percent of CMCG's gross revenue from the machines operating Raffle 3.0.

## B. Third Assignment of Error

{¶ 50} In its third assignment of error, OVFCC asserts the trial court ignored evidence demonstrating the ERMs were "upgraded" during the term of the parties' fourth exclusive agreement. As noted, the two percent fee in § I (A)(4) applied only to machines operating Raffle 3.0 or other "legal upgraded charitable electronic games." Accordingly, aside from the machines operating Raffle 3.0, the two percent fee applied only to machines that were both "legal" and "upgraded." Because we have already determined there were no other "legal" charitable electronic games, we need not further determine whether any of the ERMs were "upgraded." Accordingly, our ruling on OVFCC's first and second assignments of error renders OVFCC's third assignment of error moot. As such, we need not address the third assignment of error. *See* App.R. 12(A)(1)(c).

## C. Fourth Assignment of Error

{¶ 51} In its fourth assignment of error, OVFCC asserts the trial court failed to address an argument raised in CMCG's reply brief. In its memorandum contra, OVFCC indicated the "Net In" column on the LSRs identified "CMCG's Gross Revenue" for purposes of § I (A)(4) of the fourth exclusive agreement. In its reply brief, CMCG claimed the "Due to CMCG" column on the LSRs identified its gross revenue for purposes of § I (A)(4). The trial court did not address the parties' contentions regarding which column on the LSRs identified CMCG's gross revenue.

{¶ 52} OVFCC asks this court to "exercise[] [our] power of *de novo* review" and declare that CMCG's gross revenue for purposes of § I (A)(4) was "reflected in the 'net in' column of CMCG's LSRs." (Appellant's Brief at 39.) We decline to do so. "It is well-established that questions not considered by a trial court will not be ruled upon by [the appellate] court." *Ochsmann v. Great Am. Ins. Co.*, 2003-Ohio-4679, ¶ 21 (10th Dist.), citing *Mills-Jennings, Inc. v. Dept. of Liquor Control*, 70 Ohio St.2d 95, 99 (1982). As such, appellate courts generally "do not address issues raised in a summary judgment motion, but not decided by the trial court." *Anderson v. Bright Horizons Children's Ctrs., L.L.C.*, 2022-Ohio-1031, ¶ 59 (10th Dist.), citing *Riverside v. State*, 2010-Ohio-5868, ¶ 58 (10th Dist.). *See Tree of Life Church, FWC v. Agnew*, 2014-Ohio-878, ¶ 27 (7th Dist.), citing *Conny Farms, Ltd. v. Ball Resources, Inc.*, 2011-Ohio-5472, ¶ 15 (7th Dist.) (noting that "[w]hile it is true that an appellate court reviews a trial court's summary judgment decision de novo, [an appellate court must] not consider issues raised in summary judgment proceedings that the trial court failed to rule on"); *Murphy*, 65 Ohio St.3d at 360 (explaining that Civ.R. 56 "mandates that the trial court make the initial determination whether to award summary judgment" and the "trial court's function cannot be replaced by an 'independent' review of an appellate court").

{¶ 53} Accordingly, because the trial court did not address the parties' contentions regarding the meaning of "CMCG's Gross Revenue" in the fourth exclusive agreement, we decline to decide this issue in the first instance on appeal. Nevertheless, because we are remanding the case, the trial court may address the parties' contentions regarding the meaning of "CMCG's Gross Revenue" on remand.

{¶ 54} Based on the foregoing, we overrule OVFCC's fourth assignment of error.

### D. Fifth Assignment of Error

{¶ 55} In its fifth assignment of error, OVFCC asserts the trial court erred by failing to grant OVFCC's claim for an accounting. " 'An action for an accounting seeks a determination by a court of what may be due the respective parties as a result of the relationship between them.' " *Fontbank, Inc. v. CompuServe, Inc.*, 138 Ohio App.3d 801, 814 (10th Dist. 2000), quoting *Moore v. Sweda*, 27 Ohio App.3d 38, 39 (9th Dist. 1985).

{¶ 56} The trial court denied OVFCC's claim for an accounting because it found Mr. Given "conceded in his deposition that while OVFCC never specifically asked for an accounting, CMCG regularly sent updates regarding activity on the ERMs operated at participating member locations." (Decision & Entry Granting Def.'s Mot. for Summ. Jgmt. at 12.) At his deposition, Mr. Given stated he did not "recall specifically asking" for an accounting from CMCG. (Given Dep. at 48.) Mr. Given also acknowledged CMCG "regularly sent out updates on a spreadsheet with updates on upgrades and activity that took place at each post." (Given Dep. at 48.) CMCG representatives affirmed the OVFCC board members had access to CMCG's financial information regarding the ERMs during the parties' relationship. (Criger Dep. at 13-14.); (Price Dep. at 29-30, 51.) OVFCC also acknowledged CMCG provided it with access to CMCG's financial information during discovery in the present case. (Mar. 1, 2023 Sur-reply at 2.)

{¶ 57} Moreover, an accounting is an equitable remedy. *McNulty v. PLS Acquisition Corp.*, 2002-Ohio-7220, ¶ 80 (8th Dist.), citing *Knight v. Burns*, 22 Ohio App. 482 (8th Dist. 1926). "Ohio law has consistently held that where there is an adequate remedy at law, an equitable remedy is improper." *Id.*, citing *Associated Estates Corp. v. Bartell*, 24 Ohio App.3d 6 (8th Dist. 1985). *Accord RFC Capital Corp. v. Earthlink, Inc.*, 2004-Ohio-7046, ¶ 81, fn. 10 (10th Dist.), citing *McNulty* at ¶ 80 (stating that, because damages were "available to RFC in tort," RFC "[could not] recover on its claim for an accounting"); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). OVFCC had an adequate remedy at law in the present case, through its claim for breach of contract and the discovery associated therewith. *See Mattern & Assocs., L.L.C. v. Latham & Watkins LLP*, 2014 U.S. Dist. LEXIS 136596, *14 (E.D.Pa. Sept. 26, 2014) (stating that, because the plaintiff "ha[d] an adequate remedy at law via its breach of contract claim and the discovery that would flow therefrom, an equitable accounting [was] unavailable"); *Phillippi v. Jim Phillippi, Inc.*, 2009 U.S. Dist. LEXIS 66169, *6 (S.D.Ohio June 26, 2009) (explaining that "if Phillippi is dissatisfied with

Defendants' discovery responses, his appropriate remedy is a motion to compel discovery--not an accounting claim"); *Boland v. First Winthrop Corp.*, 2010 U.S. Dist. LEXIS 77609, *7-8 (S.D.Ohio Aug. 2, 2010).

{¶ 58} Based on the foregoing, OVFCC's fifth assignment of error is overruled.

## IV. Conclusion

{¶ 59} Having overruled in part and sustained in part OVFCC's second assignment of error, and having overruled OVFCC's first, fourth, and fifth assignments of error, rendering OVFCC's third assignment of error moot, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas. The case is remanded to that court for proceedings consistent with this decision.

*Judgment affirmed in part and reversed in part*;
*cause remanded.*

BEATTY BLUNT and BOGGS, JJ., concur.

_____